## Case No. 14,680.

UNITED STATES v. BUCK.

[17 Leg Int. 181.[1] 4 Phila. 161; 8 Am. Law Reg 540.]

District Court. E. D. Pennsylvania. 1860.

RESISTING OFFICER—ATTEMPT TO RESCUE SLAVE— FUGITIVE SLAVE LAW—INDICTMENT—TRIAL.

1. A fugitive slave having been brought by the marshal. under a warrant of arrest. before the circuit court, the case was heard. and a certificate. whose contents were conformable to the requirements of the act of September 18, 1850 [9 Stat. 462]. authorizing his removal to the state from which he had escaped, was delivered to the claimant. The claimant having afterwards made an affidavit that he apprehended a rescue. the marshal retained the fugitive in custody. placing him in charge of certain deputies or assistants. who. when engaged in removing him. were ob-

1[Reprinted from 17 Leg. Int. 181. by permission.]

structed by the defendant. The acts of obstruction constituted or included an attempt to rescue the fugitive from custody. When this occurred, neither the claimant. nor any private person as his agent. was present. *Held*, that for the purpose of the removal of the fugitive, and for incidental purposes, the certificate had established conclusively the relation of the claimant to the fugitive to be that of a proprietary master to his servant; that the subsequent custody of the marshal was lawful only in consequence of the master's affidavit, and might have been terminated by him at any time: that if it had been thus terminated. or had been interrupted. or had never taken effect, the right of custody would have been in the master alone; that the marshal's custody, while it continued. was not incompatible with any reasonable intervention. control. direction. or participation of the master in which the marshal might acquiesce. but that the custody, unless actually assumed by the master. was. through his affidavit, continued in the marshal, in the same official character in which he had held the fugitive under the warrant of arrest; that the defendant might therefore have been indicted under the 22d section of the act of April 30, 1790 [1 Stat. 112]. for obstructing the marshal as an officer. but that he was liable also to indictment under the 7th section of the act of September 18. 1850. for the attempt to rescue from the custody of the marshal and his assistants.

2. Under an indictment for such an attempt, the prosecution may be maintained without the adduction of any independent evidence that the fugitive owed service or labor, and had escaped from the state in which it was due.

3. Such an indictment contained averments of the issuing of the warrant of arrest. and of the subsequent proceedings. including the certificate and affidavit. These averments were preceded by allegations that the fugitive had escaped, and that he owed, in the state from which he had escaped. service or labor to the claimant. *Held*. that the enactments of the law of September 18, 1850. as to the conclusiveness of the certificate. rendered these preceding allegations matters of mere inducement. and that. the certificate having been produced in evidence. no independent proof of them was required in order to sustain the prosecution.

4. Such a prosecution is not maintainable unless the defendant acted "knowingly and willingly." But his only ignorance that can excuse him is ignorance of the existence of the custody, or of its lawfulness. Where he might. upon inquiry. have readily known the truth. his omission to inquire is evidence from which his actual knowledge of the truth may be inferred. This is particularly the case where the custody is official.

5. A court of the United States ought never to sit with its doors of entrance closed, so as to prevent publicity in its proceedings. But its police must be maintained. Where the court has not prescribed any general rule. or made any special or particular order. on the subject. the specific duty of the marshal to maintain and regulate its police according to law is an incident of his general duty to attend the court. When, during the pendency of a particular proceeding, there is reason to believe that an unrestricted admission of persons of a known class or association would endanger the security of the administration of justice. or in any manner prevent the police of the court from being properly maintained. the marshal. without excluding absolutely such persons. as a class. may adopt prudential measures to prevent their indiscriminate admission. regulating the exercise of his discretion so that their exclusion is not carried beyond the exigency of the particular occasion.

[This was an indictment against Jeremiah Buck for an attempt to rescue from the custody of the marshal a fugitive slave.]

CADWALADER, District Judge. The government of the United States exists through a delegation of specifically defined powers, which the several states have yielded upon certain conditions. The rightful continuance of the government is dependent upon the faithful performance of these conditions. One of them is that fugitives from justice, found in a state into which they have fled, shall be delivered up for removal to the state having jurisdiction of their alleged crimes. Another condition is that slaves escaping from one state into another shall be surrendered. In the case of a fugitive from justice, the surrender is to be made on the demand of the executive authority of the state from which he fled. In the case of slaves, it is to be made upon a claim by the party to whom their service or labor is due. In legislating for the fulfilment of these two constitutional conditions, congress has never assumed the power of disposing at pleasure of the custody of a fugitive of either kind. The constitution would not have sanctioned any such arbitrary legislation. The fugitive from justice has been surrendered into the custody, not of an officer of the United States, but of an agent or duly accredited representative of the state, by whose executive authority the demand has been made. The fugitive slave cannot, unless at the desire of the claimant whose right has been established, be delivered into any other custody than that of such claimant. When, at his desire, the fugitive is delivered into the custody of an officer of the United States, this officer's custody is temporary and its purpose limited. It exists only for the protection or security of the right which has been established, and cannot be exclusive of the control of the possessor of such right. This right is that of a proprietary master of the fugitive. The legal importance of keeping this distinctive character of it in view will be seen hereafter.

In the first legislation of congress, under these two clauses of the constitution, the subjects of both were provided for in a single statute. This act, which was passed on 12th February, 1793 [1 Stat. 302], has not been followed by any further legislation, so far as the surrender of fugitives from justice is concerned. The jurisdiction under this head is not exercisable under the act by the judges or officers of the United States, but by the governments of the several states. The jurisdiction and powers for the surrender and return of fugitives from service or labor were vested by the act in judicial officers of the United States, and concurrently, in certain local magistrates of the several states. This legislation on the subject of fugitive slaves was extended by the act of September 18, 1850. So far as this act has modified or superseded the previous law, no jurisdiction or authority is vested in any state officer or magistrate. The owner of a fugitive slave is not bound to proceed under either of these laws. He may follow the slave into the state into which he has escaped, and may, without any legal process, arrest him there; and may, without any judicial certificate, or other legal attestation of the right of removal, carry him back to the state from which he escaped. All this may be done lawfully. But, if the owner does not, under one act, or the other, obtain a certificate of his right of removal, he becomes liable as a trespasser, for the arrest, detention and removal, unless he can prove the escape, and that the fugitive owed him service or labor in the state from which he fled.

In a proceeding under the act of February 12, 1793, the arrest of a fugitive slave was made without any warrant or other process. He was taken by the claimant, or his agent, before a judge of one of the courts of the United States, or a local magistrate, who, upon the adduction of the requisite proof, gave a certificate which served as a warrant for the removal of the fugitive to the state or territory from which he had escaped. This act contained no express provision that the certificate should have any conclusive effect as proof of the right of removal. The act of September 18, 1850, provides that the alleged fugitive may be arrested by the claimant, either without process, or under a warrant issued by a court or judge of the United States, or by one of the commissioners of a certain description, appointed by designated courts of the United States. It vested in any one of these commissioners a jurisdiction concurrent and co-extensive with that exercisable by a court of the United States, or one of the judges of such a court. This act required the marshals of the United States and their deputies to obey and execute all warrants and precepts issued under its provisions when to them directed. It imposed a pecuniary penalty for any refusal or neglect to receive or execute such process, and made the marshal, in case of an escape, with, or without, his assent, after arrest, liable on his official bond for the value of the fugitive, according to a prescribed standard. The commissioners were authorized, within their respective counties, to depute, by writing, one or more suitable persons, from time to time, to execute such warrants and other process as might be issued by them in the lawful performance of their respective duties. The commissioners, or the persons thus deputed by them to execute process, were authorized to summon, and call to their aid, the by-standers, or posse comitatus, when necessary. Their warrants were to run and be executed any where in the state within which they were issued. In a proceeding conducted according to the provisions of this act, the alleged fugitive, whether arrested under a warrant, or without process, is brought before a court or judge of the United States, or a commissioner whose duty it is to hear the case of the

claimant in a summary manner. If the claim is established, the court, or judge, or commissioner, delivers to the claimant or his agent, a certificate setting forth substantially the facts established, and authorizing him to use the reasonable force and restraint necessary, under the circumstances of the case, for the return of the fugitive to the state whence he escaped. This law makes the certificate thus delivered conclusive of the right to remove the fugitive to such state, and enacts that it shall prevent all molestation of the claimant by any process issued by any court, judge, magistrate or other person whomsoever. The certificate as described succinctly in the 4th, and more fully in the 6th section, answers a two-fold legal purpose. It ascertains the claimant's right to remove the fugitive, and constitutes, or includes, a warrant for his removal.

In a prior stage of the cause, I had occasion to express an opinion, which I now repeat, that, under an indictment for an offence against this law committed after such a certificate has been delivered to the claimant, its production in evidence renders independent proof that the fugitive owed service or labor to the claimant, and that he escaped from the state in which it was due, unnecessary on the part of the prosecution. I also expressed an opinion that though such an indictment contained allegations that he had escaped, and owed the service or labor, followed by an averment that the certificate had been awarded, the enactments of the law of 1850, as to the conclusiveness of the certificate, rendered these preceding allegations matters of mere inducement, of which no independent proof was required, in order to sustain the prosecution. I still am of this opinion. The question, whether the alleged fugitive was a slave or not cannot be tried under such an indictment. Where the claimant, after the certificate of his right has been issued, makes affidavit that he has reason to apprehend a forcible rescue of the fugitive before he can be taken beyond the limits of the state in which the arrest was made, the act requires the officer who made it to retain the custody of the fugitive, and remove him to the state whence he fled, and there deliver him to the claimant. The act also authorizes and requires the officer to employ and retain for this purpose, at the expense of the United States, as many persons as he may deem necessary to overcome such force. In a clause which defines the rate of compensation for such service, and of the allowance for expenses, the persons thus employed by the officer are designated as his assistants. The standard here prescribed is that of the compensation and allowance in cases of transportation by the marshal of persons charged as criminals.

In the present case, the testimony shows that, under a warrant of arrest, a fugitive slave had, under this act, been brought in the lawful custody of the marshal before a judge of the circuit court; that the right of the claimant had been established, and the certificate prescribed by the act of 1850 had been issued, when the claimant's affidavit that he had reason to apprehend a forcible rescue was regularly made; that a copy of this affidavit was in the hands of the marshal, or his principal deputy; that the marshal, therefore, conformably to the provisions of the law, retained the fugitive in custody, and was in the act of removing him from the court house, when the occurrences on which the prosecution is founded took place. These occurrences were very remarkable. They took place in the public street, in the face of day, in open defiance of the law. The doorway leading from this court into Fifth street is distant not more than about sixty yards from the point on the north side of Chestnut street, a little westward of Seventh street, where the defendant was arrested. The intervening space is occupied, on the same side of Fifth street, by offices of the police of the city. There was in the street a crowd chiefly composed of colored persons. More than fifty officers of the city police were stationed there to keep the passage clear. These officers wore their badges. This was the state of things when the fugitive was brought by the marshal, or his principal deputy, through the Fifth street doorway, and placed in a carriage. Three deputies or assistants of the marshal, including his principal deputy, took seats inside of the carriage and another assistant or deputy took a seat by the driver. The carriage then got under way towards Chestnut street. An immediate movement from the eastern footway towards the street pavement appears to have been made by colored persons who crowded forward in such a manner as to impede the progress of the carriage. An attempt to stop it was made when it had advanced only a few paces. Before it reached Chestnut street, this attempt had been repeated once or twice, if not three times. The speed of the horses was increased as they approached Chestnut street, and was becoming rapid as their heads were turned westward in order to pass up that street. At this point, the portion of the crowd which had been in the carriage way of the street, appears to have been left behind, but to have been following closely in the rear. The carriage would probably have soon left the great body of them far behind, if its progress had not been again stopped in a more violent manner than on the previous occasions. Here some colored persons who rushed from both footways into the carriage way, seized the heads of the horses on both sides, and forced them on the side walk against an iron awning post, when several arrests, including that of the defendant, were made by officers of the city police. The period from the time at which the carriage left the door of the court house to the time of their arrest, was probably not more than one or two minutes. There had been confusion and noise during

the whole of this period, the colored persons crowding towards the carriage and exhibiting great excitement. Several witnesses heard the word "rescue" shouted. Robert Williamson says that he heard it shouted loud by more than one voice before the carriage reached the corner of Chestnut street. Edward G. Wood and Robert Wilson state that White, one of the men arrested, called "rescue." Wilson says that White called rescue before Buck the defendant came up. Seven witnesses, namely, Trefts, Robinson, Brodie, Wood, Barry, Axe, and Williamson, positively identify the defendant as one of the three principal actors in the scene which occurred when the horses were forced upon the pavement. Mr. Wood, Robert Williamson, Axe and Barry describe this occurrence particularly. The clearest account seems to have been that of Mr. Wood. According to their testimony White seized the horses on one side and the defendant on the other, while Green took hold of the traces and with an uplifted cane was striking at the driver. Barry describes the defendant as the person most active in hauling the horses on the footway. Mr. Axe, the policeman who arrested him, describes him as violently excited and exerting great strength in keeping his hold on their heads. White and Green were arrested at about the same time. What occurred afterwards is not important except that their arrest seems not to have prevented a fresh outbreak of similar violence. The crowd moved up Chestnut street and the disturbance continued. If you believe the witnesses for the prosecution, and give due effect to their testimony, you will probably have no doubt that the defendant, at the time of his arrest was engaged with others, both in obstructing the execution of process by the marshal, and in attempting to rescue from custody the fugitive whom the marshal's deputies had in charge. The latter, as I will state hereafter, is the only offence for which the defendant is on trial.

The defendant is not thus guilty unless he thus acted knowingly and wilfully. He however cannot allege ignorance of law as an excuse. No man can ever allege this excuse. Every person is bound, and is presumed, to know the law. Otherwise the pretence or excuse of ignorance of it would be urged in every case. The only ignorance that can be alleged in excuse is ignorance of the fact which renders an act unlawful. In this case, the only excuse which could be admitted under this head is that of ignorance that the fugitive was in lawful custody. The question of such ignorance in cases under the fugitive slave laws has usually arisen where an alleged fugitive was in the hands of the claimant, or his agent; that is to say, in the hands of private persons not officers of the law. The circuit court of the United States for the Ohio district have decided many such cases, particularly under the act of 1793. In two cases that court used words which I will quote: "To bring an individual

within the statute, he must have knowledge that the colored persons are fugitives from labor, or, he must act under such circumstances as show that he might have had such knowledge by exercising ordinary prudence." Giltner v. Gorham [Case No. 5,453]; Weimer v. Sloane [Id. 17,363]. Without stating any rule in this precise form of words, I instruct you that if the defendant, from circumstances within his observation or means of immediate inquiry, might readily have known the truth, a belief of his actual knowledge of it may be reasonably deduced. In cases of mere private custody of an alleged fugitive, the application of such a rule may, according to varying circumstances, be difficult or easy. But there seldom can be difficulty where the custody is that of an official person. The true character of such a custody if not apparent or known, may usually be ascertained without any difficulty by a person desirous of knowing the truth. In this case, the place, the persons and the circumstances, indicated that the custody was both lawful and official. Could there have otherwise been any doubt it would have been removed by the fact that the city police, with their badges exhibited, were on the spot. They would, if there had been any thing unlawful, have been the persons to redress the wrong. If you believe the testimony, they must have been seen to be protecting, or endeavoring to protect, the carriage and those in it from such violence as that in which the defendant was immediately afterwards engaged. You probably, therefore, would have no difficulty in finding that he acted knowingly and wilfully, if the case rested upon the testimony for the prosecution alone. But the defendant has examined a number of witnesses, as persons in the same situation as himself in respect of the occurrences in controversy, every one of whom, so far as I remember— certainly almost every one—knew the general character and particular description of the case that was pending; knew that the person put into the carriage was the fugitive or alleged fugitive; knew that he was in custody of the marshal; knew the person of either the marshal himself, or of one of the deputies who accompanied the prisoner; and knew the court room and the marshal's office, and, of course, knew the doorway leading from it into the street. (Some parts of the testimony under this head were here particularly quoted by the court in the words of the respective witnesses.) The defendant's testimony on other points is of no materiality that I can perceive. (Here the court reviewed this testimony in detail, comparing it with the counter evidence.) If the jury take a different view of the evidence, the decision upon the facts is for them, and not for the court. This remark applies to all the facts in the cause. If there is any reasonable doubt concerning them, the defendant is entitled to the benefit of it.

The testimony as to his general good character should avail him so far as it may serve to create any reasonable doubt of his guilt, or to increase any doubt of it that might otherwise have existed.

A suggestion on behalf of the defendant is made in the form of a complaint urged against the marshal, or some of his deputies, for keeping colored persons out of the court room during the hearing of the case of the fugitive slave, though white persons were admitted without objection. I do not understand the bearing of the testimony under this head as matter of defence. If the complaints were well founded, it would not justify, or excuse, an assault upon the officers, much less an obstruction of the execution of legal process, or an attempted rescue from official custody. Independently of any question in this cause, the subject is, however, of great importance; and, as it has been publicly discussed, should not be passed without notice. If colored persons, as a class, were excluded from the court room for any reason which would not, under like circumstances, apply to white persons, a mistake was committed. The marshal had no right or power to exclude them for any such reason. I cannot believe that he or his deputies were so ignorant of their duty that such a mistake was committed. But if a class of persons, white or colored, are, for any reason, dangerous attendants upon a court, so dangerous as to interfere with its police and security, some discrimination as to their unlimited admission may, from necessity, be exercisable while the danger continues. Courts of justice must be open; but their police must also be maintained. If a subject of judicial investigation is one as to which any known class of persons are too much excited in feeling to be able patiently to attend upon its discussion, an indiscriminate admission of all persons of the class would sometimes be very dangerous. (Here the court exemplified this proposition in its possible application to cases other than that in question.) In the case of a fugitive slave, the danger of admitting indiscriminately persons whose feelings might have prompted them to act like those who made the attack upon the carriage on the occasion in question, might endanger the police of a court. This danger, where it exists, the marshal, who maintains its police, cannot properly disregard. A discrimination of some kind appears to have been exercised by him on the occasion in question. Colored persons, including those who afterwards committed acts of illegal force, appear to have attended in great numbers, and to have endeavored to obtain admission into the court room an hour before the time at which the court was to be opened. Had they been indiscriminately admitted at that time, the court room and its avenues would probably have been occupied by them to the exclusion of all other persons. What may have been observable during that

hour of the temper and feeling of these colored persons, what may have been known of the character or former conduct of any of them, we could not here inquire. But, the events of the afternoon prove that there may have been sufficient reason for the marshal's refusal to admit them indiscriminately in the morning. We have no means of inquiring into the reasons by which his discrimination was particularly regulated. The testimony shows that colored persons of good character, whose usual deportment was quiet and orderly, were not able to command their feelings on the day in question so as to abstain from acts of lawless violence. This proves that any exercise of discrimination on his part must have been attended with embarrassing difficulties and possibly dangers. That colored persons generally were excluded from the court room seems to be true. That they were not excluded indiscriminately is, however, not less true. In the course of the testimony, it came out casually that the marshal himself directed the admission of one to whom entrance had been refused by the deputy; and that the deputy, without the marshal's order, admitted another. There is no reason to believe that others may not also have been admitted. One witness, the colored clergyman, who was refused admittance, says that he had "quite a squabble" with one of the marshal's deputies. This witness admits that his feelings were deeply interested. How far he may have been excited, whether he may have used language of a tendency to excite the feelings of others, are inquiries which would have been out of place here. But such considerations may not have been improperly entertained by the marshal on that occasion. Besides his duty to maintain the police of the court, he had the custody of the fugitive, and was liable for an escape though he had been forcibly rescued. We therefore cannot, in a collateral proceeding like the present, ascertain whether his conduct was, or was not, wisely regulated in the precautions which he used in order to prevent an indiscriminate admission of all persons into the court room. Had a rescue been the result of his omission to adopt adequate precautions, the case might have undergone an investigation in which his neglect would not have been thought excusable. It is fortunate for the jury, and for the country, that we are not now engaged in such an investigation.

The duty of stating and explaining the law of the case remains to be performed. This duty devolves upon the court. In a criminal case, the jury can judge of the law as well as of the facts. But where the jury cannot know the law otherwise than as it may be stated by the court, their duty is to believe that the court states it correctly. If there existed no law for the punishment of an act like that of which the evidence tends to prove this defendant guilty, the United States would cease to have a government. No gov-

ernment can be administered unless its laws can be enforced, and resistance of their execution punished. Under the government of the United States, large standing military garrisons posted throughout the land in strong fortresses have not been thought necessary for the enforcement of the laws. No such military organization will become necessary, so long as the government's judicial organs, which designation includes juries as well as courts, fulfil their duties to the constitution and the laws.

The only question of law which has not already been sufficiently considered is. whether the present prosecution can be sustained under the indictment? The act of 1793 imposed penalties for obstructing an arrest by the claimant, and rescuing, harboring, or concealing the fugitive. But these were only pecuniary amounts, recoverable in a civil action by the claimant for his own benefit. Under this act, there was no official custody of an alleged fugitive slave except constructively during the hearing before the judge or magistrate. But, under the act of 1850, the proceedings may, at every stage of them, be conducted under legal sanction, and the alleged fugitive may, not only during the hearing, but before and after it, be in custody under legal process. This, however, as we have already seen, is an optional method of proceeding. The claimant in person, or by an unofficial agent. may still make the arrest without process, and bring the fugitive before the court, or judge, or commissioner; and, after the receipt of a certificate under the act, may take the fugitive into his private custody, without asking official protection of any kind. The 7th section of the act, in view of these alternative and optional modes of proceeding, made it a criminal offence knowingly and willingly to obstruct, hinder, or prevent the claimant, his agent, or assistants from arresting the fugitive with or without process, or to rescue or attempt to rescue him from the custody of the claimant, his agent, or assistants. when arrested, or to aid, abet, or assist the escape of the fugitive from the claimant, his agent, "or other person or persons legally authorized as aforesaid," or to harbor or conceal the fugitive so as to prevent his discovery and arrest after notice or knowledge that he was a fugitive from service or labor. The indictment is founded upon this enactment. It charges an attempted rescue of the fugitive. The first count, after stating the warrant of arrest. and subsequent proceedings to the granting of the certificate. avers that the affidavit of apprehension of a rescue was afterwards made by the claimant, and lays the offence as an attempt to rescue from the custody of the marshal, and the persons employed by him according to the provisions of the act. The second count, not mentioning the affidavit, lays the offence as an attempt to rescue from the custody of the claimant, and certain persons described as his assist-

ants, who, in fact, were the marshal, and persons mentioned in the first count. These two counts are properly joined in the same indictment. But it does not follow that a verdict of guilty upon both can be properly found. If the claimant, after the receipt by him of the certificate, had not taken the affidavit, your verdict, if rendered against the defendant, would have been properly found upon the second count. But, as the affidavit was taken, and neither the claimant, nor any unofficial agent on his part, was actually present when the offence was committed. the verdict, if against the defendant, should, I think, be a verdict of guilty upon the first count only.

The remaining inquiry, therefore, is, whether the prosecution can be supported upon the first count. On this point I had some doubt in an early stage of the trial. But this doubt has been removed; and I am now of opinion that the prosecution, so far as the case depends upon matter of law, can be maintained upon this count. The objections to this view of the question will be stated and answered. They depend upon an assumption of three propositions. The first is that an obstruction of an officer of the United States in the execution of legal process of any kind is indictable under the 22d section of the act of congress for the punishment of crimes, passed on April 30, 1790, before any legislation of the United States, as to the recaption of fugitive slaves, and that the defendant, if guilty of any offence, was indictable under that act. The second proposition is. that when the claimant, after the receipt of the certificate, made the affidavit, the custody of the fugitive was in the marshal alone, and was, in law, an exclusively official custody. The third, stated partly as an independent proposition, and partly as connected with, or dependent upon the first and second, is, that the 7th section of the act of 1850 does not apply to any interference with or obstruction or prevention of an officer of the United States in the execution of process. but was intended only for cases of interference with or obstruction of private persons having a fugitive slave in lawful custody.

The first proposition, that this defendant might have been convicted under the act of 1790. of an obstruction of the marshal in the execution of process. is, I think, true. I do not think that this exempts. the defendant from being liable also under the present indictment founded upon the act of 1850. The first proposition will, however, be considered, in order that its connection, or want of connection, with the two others, may afterwards be discussed. The 22d section of the act of 1790 made it a criminal offence, knowingly and wilfully to obstruct. resist. or oppose any officer of the United States in serving, or attempting to serve or execute any mesne process. or warrant, or any rule or order of any of the courts of the United States, or any other legal or judicial writ or process what-

ever, or to assault, beat, or wound any officer or others person duly authorized in serving or executing any writ, rule, order, process, or warrant, aforesaid. This section, and some others of the same act, are prospective in their operation. The section applies, therefore, to obstructions of the execution of process by officers of the United States, acting under jurisdictions established by subsequent acts of congress. In the language of Judge Washington, it includes all legal process in the hands of an officer of the United States. U. S. v. Lukins [Case No. 15,639]. His language, which I have only partially quoted, justifies the remark of Judge Curtis, in the year 1851, repeated in 1854, that "it embraces every legal process whatever, whether issued by a court in session, or by a judge, or magistrate, or commissioner, acting in the due administration of any law of the United States." 2 Curt. 639, Append. This remark, it is true, was made only in a charge to a grand jury; and therefore has not the authority of an expression of an opinion in the course of a legal adjudication. But the subject came soon after before the same judge in a judicial proceeding in which it was assumed, though not decided, that an attack upon the marshal while in custody of an alleged fugitive from service, could, if the indictment was properly framed, be made the subject of criminal prosecution under this section of the act of 1790. It also appears that the subject had been for three years under the consideration of Judge Curtis, without any change in this opinion expressed by him originally in the year 1851. Independently of this authority, I should, upon the words of the act, and the authority of Judge Washington's opinion, have arrived at the same conclusion. I have, therefore, no difficulty in stating my opinion that any wilful obstruction of a marshal, deputy marshal, commissioner, or other officer of the United States, while executing a warrant of arrest under the fugitive slave law of 1850, or while in custody of a fugitive, in consequence of a claimant's affidavit, made after the certificate has been delivered to him, is indictable under the act of 1790. But, I am of opinion, as will appear more fully in considering the second proposition, that it is thus indictable only where the marshal is in the actual custody of a fugitive.

The second proposition as to the alleged exclusiveness of the marshal's custody has been in part anticipated at the commencement of this charge. The constitution requires the delivery of the fugitive to the claimant, whose relation to him is that of a master to a servant. As a husband may retake his wife, a parent his child, or a guardian his ward, so a master may retake his servant wherever he may find him; and, in the case of a servant of this description, may retain him in custody and under control. In defining the power and rights of the person to whom the service or labor is due, elementary rules of juris-

prudence as to these domestic relations, contained in 3 Bl. Comm. 4, have therefore been adopted by the supreme court as applicable to the interpretation of acts of congress passed under this clause of the constitution, and even to the interpretation of the constitutional provision itself. [Prigg v. Pennsylvania] 16 Pet. [41 U. S.] 613; [Jones v. Van Zandt] 5 How. [46 U. S.] 229. A parent's or guardian's custody of his child, or a master's proprietary custody of his slave may be assisted, promoted, enforced, or maintained by the custody of an official functionary. But, in an ordinary case, the assistance of such a functionary to the lawful custody of the master, does not supersede or annul it, and, under the constitution and laws of the United States, could not lawfully annul it. Consequently, though the marshal's custody of the fugitive in this case was official, so far as it extended, yet, it was not through any legal necessity, exclusive. It may have been exclusive in fact, but it was not, even then, independent of possible intervention by the master.

The act of 1850, makes it the duty of the officer, after the certificate issued, upon the affidavit of apprehension of rescue, to retain the fugitive in custody for the purpose of removal. The counsel on both sides agree that this word "retain" defines the character of the official custody, which must, for general purposes, be the same before and after the certificate. There is, however, a certain specific distinction which may, for particular purposes, be attended with important differences. Until the certificate is issued, the right of the claimant is undetermined. The period of the hearing of the case may be excluded for the present from consideration. In this period there can be no control or direction on the part of the claimant, and the custody of an officer must be subordinate to that of the court. or judge or commissioner. The distinction to which I advert is between the custody which before the hearing may exist under the warrant of arrest, and the custody which may, after the certificate, be retained by the officer in consequence of the affidavit of apprehension of rescue. The warrant of arrest is legal process directed to the officer, which he is bound to return to the court or judge or commissioner. Whether the proceeding under this writ, until it is executed by an arrest, is under the exclusive control of the claimant is a question which it is not necessary to decide. When it has been primarily executed by an arrest, the claimant before it is returned to the court, or judge, or commissioner, may possibly have the right of abandoning the proceeding, and ordering the alleged fugitive to be set at liberty. Whether the alleged fugitive may not insist on being brought before the court, or judge or commissioner is a point upon which it is not necessary to express an opinion. The claimant certainly cannot, for any other purpose than that of the absolute liberation of the alleged fugitive, interfere with the official custody of

him between the time of arrest, and the time at which the process is returned to the court, or judge or commissioner. Unless there is an absolute discharge, the officer must return it and bring in the alleged fugitive. To this extent the claimant, by taking out the process, has, until its return, surrendered or qualified the personal exercise of his alleged right as master. But, in this interval between the arrest and the return, the custody of the officer is, even to this extent, exclusive in those cases only where it is an actual custody. When he does not find the alleged fugitive, the claimant, if able to find him, can lawfully take him. If, after arrest, the officer dies, or becomes incapable of acting, or if he wrongfully refuses to retain the fugitive in order to return the writ, and improperly liberates him, the claimant may take or keep him as if there had not been any process. In these, and in other cases which might be specified, the claimant, at the peril of afterwards proving his ownership of the fugitive, may take him or may temporarily control and regulate the custody. This could not be done under process in an ordinary legal proceeding. Under the warrant of arrest, there may possibly be difficulties inherent in some of these questions. But, there can be no such complication after the certificate has conclusively settled the question of the right of removal. The marshal, or other official custodian,—when the affidavit of apprehension of resuce has been taken after certificate issued—retains his former custody against all the world except the claimant; but he retains it for the exclusive protection and security of the claimant, whose concurrent, or substituted control or custody of the fugitive cannot then be wrongful. The certificate is conclusive of the right of removal to the state from which the fugitive had escaped, and no tribunal can question its effect for the purposes of the removal; but, it is not like the warrant of arrest, returnable to the court, or judge, or commissioner by whom it was issued. It is not, like the warrant of arrest, process directed to the officer. It is a certificate in favor of the claimant himself. So far as it constitutes a warrant for the removal of the fugitive, it is exercisable by the claimant whose right has been established. The custody of the marshal is, therefore, as between him and the claimant, auxiliary only. He is an official assistant of the claimant. In order to give the full protective benefit of his official character to the claimant, the act of congress prescribes that the custody shall be not less official than under the former warrant of arrest. Nevertheless, the claimant in whose favor the certificate has been awarded, may at any time, discharge the officer, may act as the custodian of the fugitive while the officer is present. Questions may indeed arise whether this can be reasonably done by a claimant who requires the continuance of the marshal's custody. But such questions can occur only between the officer and the claim-ant, and must be settled between themselves. Third persons cannot be concerned in any such question. The custody of the marshal, therefore, though it may be exclusive in fact, is not necessarily from its character, exclusive in law. Consequently, as I have already instructed you, an indictment which alleges an attempt to rescue from the custody of the officer and his assistants would not be supported by the mere production of the certificate of removal and affidavit of apprehension of rescue, and proof of a subsequent attempt to rescue, without the further proof, which has been adduced here, that the officer had, in fact, the custody when the attempt was made.

If the foregoing views are correct, a principal difficulty which might otherwise have been encountered in considering the third proposition, has been removed. This proposition is, that the 7th section was not intended to apply to an attempt to rescue from the custody of an officer of the United States, but was applicable exclusively to such unlawful interferences with unofficial custody, as would not have been indictable under the act of 1790. When the words of the 7th section are carefully considered, their applicability to lawless interferences with such official custody as the other enactments of the statute authorize becomes unquestionable. The question specifically presented might be discussed on somewhat narrow, or on more extended views. The result of each mode of reasoning would, perhaps, be the same. Under the narrower view, it is obvious that there might be cases of such attempts to rescue from official custody as would fail or be frustrated before they amounted to obstructions of the official execution of process. Such attempts would not be indictable under the act of 1790. According to the argument in this case for the defence, an attempt of this kind to rescue from private custody would be indictable, but the more aggravated offence of such an attempt to rescue from official custody would not be punishable. There is no probability that this can have been intended by congress. But the question may, I think, be determined on the broader ground, that there is no distinction between an official and an unofficial custody under the 7th section of the act of 1850 except so far as the phraseology of indictments may require variation in order to adapt them to the specific distinctions of different cases under the act. That this was the opinion of Judge Nelson appears from his charge to the grand jury, delivered at the October sessions of 1851, in the circuit court for the Northern district of New York. 2 Blatchf. Append: 560. I do not refer to what he said in such a charge as having the full force of judicial authority. But this charge serves to explain the form of the indictment afterwards found in the case of U. S. v. Reed [Case No. 16,134]. This indictment had been removed by certificate from the district into the circuit court. In another case, U.

S. v. Cobb [Id. 14,820], in which the opinion of Judge Conkling on a preliminary hearing is reported, a bill had also been found in the district court, and, as I infer from a subsequent account of it, had also been certified into the circuit court. In each case, as we may infer from the reports which we have, the indictment was founded upon the 7th section of the act of 1850. Both cases arose from the rescue of an alleged fugitive slave on 1st October, 1851, at Syracuse. The rescue was from a deputy marshal who had him in custody under a warrant of arrest issued by a commissioner. This rescue had prevented any hearing from taking place. The case was, therefore, that of a rescue from a custody of a character as official as any of which the existence under the act of 1850 can be recognized as possible. A motion was made afterwards to quash the indictment. This was about a year after the charge of Judge Nelson to the grand jury. The point now in question does not appear to have been made in the argument of the motion. It may perhaps have been reserved by counsel to be taken on the trial, or upon a motion in arrest of judgment. But attention must have been directed to it from the remarks upon it in the previous charge to the grand jury; and the reasoning and remarks in the court's opinion [U. S. v. Reed, supra] seem to cover the question and to affirm the validity of an indictment under the act of 1850, for a rescue from official custody. The same view seems to have been tacitly assumed to be correct in U. S. v. Williams [Case No. 16,705], in the circuit court for this district, under an indictment for obstruction of process, tried before Judge Kane after the decision of a well-known case arising from the same transaction, in which there had been a prosecution for treason.

Independently of any reported case, I would have arrived at this conclusion upon the words of the act of 1850. It certainly makes the offence of preventing an arrest indictable, whether the claimant, or those assisting him, were endeavoring to make it "with or without process;" and the context shows a connection of these words with the subsequent specification of the other offences, including that of a rescue or attempt to rescue. Therefore, if the acts which are in question in this case had occurred before the hearing, the offence would have been indictable, though the alleged fugitive had been in the custody of the marshal. Consequently, the official character of the custody was, in the primary stage of the proceeding, immaterial. We have seen that, if there was any distinction after the certificate and affidavit, the official character of the custody was then, in law, less material. But the act seems, in this respect, to place them on the same footing, by enacting, in effect, that the officer shall, in this latter stage of the proceeding, retain his former

24FED.CAS.—82

custody. The rule must therefore be the same in both stages, and the reason for its application in the latter stage is more forcible. I am consequently of opinion that, if you take the view of the facts which the testimony appears to warrant, your verdict, so far as the law of the case is concerned, should be that the defendant is guilty upon the first count, and not guilty upon the second count, of the indictment.

Verdict accordingly.