Husband, C., Plaintiff, Appellant,

v.

Wife, C., Defendant,

v.

NEWS JOURNAL COMPANY, Intervenor, Appellee.

Supreme Court of Delaware.

April 19, 1974.

**718**

L. Vincent Ramunno, Wilmington, for plaintiff, appellant.

Rodman Ward, Jr. and Robert W. Ralston, Wilmington, for intervenor, appellee.

Before CAREY, Associate Justice, and QUILLEN, Chancellor, and STIFTEL, President Judge.

QUILLEN, Chancellor:

This is an appeal from an order of the Superior Court allowing the intervenor, the News Journal Company, to examine the court file in a divorce action. That order has been stayed pending this appeal. The issue presented by this case concerns the extent of the right of public access, here press access, to court records under our divorce law.

The appellant is Husband, C., an elected state public official, who successfully sued his wife for divorce, the action having been contested. The trial, which, pursuant to the general practice under our statute, was closed to spectators, was conducted from September 10 through September 14, 1973. In addition, during the trial, the file was sealed by Court order after a request by counsel. Thereafter, a reporter for the intervenor, which publishes two daily newspapers in the Wilmington area, asked the trial judge orally for permission to examine the file, citing in support of his request 13 Del.C. § 1506. The request was granted orally on September 24. A stay was issued by a Justice of the Supreme Court on the following day.

Subsequently, while decision on the merits of the divorce suit was still pending below, the record access matter was appealed by the husband and oral argument was held before this Court. On October 26, 1973, due to an almost complete absence of a record on the point raised by this appeal by the husband, we remanded the case to the Superior Court for the limited purposes of permitting the News Journal to intervene, of making a complete record, and of properly certifying the trial court's record. We directed that the matter be returned to this Court once the record had been corrected as ordered.

The record now contains a letter of the trial judge dated October 17, 1973 which states the reasons for his decision in the following language:

"Under the provisions of Title 13, Section 1506, I have no discretion in regard to impounding or refusing access to the entire file, including a transcript of the proceedings that may have been filed, and also any depositions that have been filed, including those portions of depositions that were not introduced at trial."

Initially, the intervenor raises a procedural objection to the present appeal. The intervenor recognizes that this Court has appellate jurisdiction "to determine finally all matters of appeal in the interlocutory or final judgments and other proceedings of said Superior Court in civil causes . . . ." Delaware Constitution, Article 4, Section 11, Del.C.Ann. However, it is urged that the order in the present case is not interlocutory. In the alternative the intervenor argues that, if this Court decides that the order is interlocutory, then it is not appealable because the order does not settle a substantial issue nor determine legal rights.

■ An interlocutory judgment is one made in the progress of a case, and which is only intermediate and does not finally determine or complete the suit. 2 Woolley, Delaware Practice § 764 (1906). Intervenor argues that such an order must also relate to the parties to the suit, citing Nadler v. Bohen, Del.Supr., 238 A.2d 836 (1968) as follows:

> "It is to be noted that for an interlocutory order to be appealable, it must accomplish two things—first, it must determine a substantial issue *in the cause* and, second, it must establish a legal right." (Emphasis supplied by intervenor) 238 A.2d at 837.

We feel that the intervenor's first argument is, in the present context, a narrow technical construction designed primarily to avoid a legal determination of the merits of the appellant's claim. It may well be that the procedural aspects of this case could have been handled differently and better at the trial level, at the one justice appeal level on the question of a stay, and at the full court appeal level at the time of the remand. Once the legal issue was drawn, however, it was obviously necessary to have the intervenor before the Court formally. In the context under which we received the case, intervention, rather than a new lawsuit, such as mandamus, appeared to us to be the most expeditious and best method.

■ Accordingly, we find that, by the corrected record, the News Journal is a party by intervention and the order appealed from is an interlocutory order in the case, notwithstanding the informal, oral and administrative nature of its origin. Superior Court Rule 24. In short, this is a case where it is appropriate to give a liberal construction to this Court's appellate power in order to facilitate the ends of justice and to prevent alleged procedural irregularities from interfering with appellate rights. Crossan v. State, Del.Supr., 281 A.2d 494 (1971); Knight v. Haley, 6 W.W.Harr. 366, 176 A. 461 (Super.Ct.

1934); Thompson v. Thompson, 3 W.W. Harr. 593, 599, 140 A. 697, 700 (Sup.Ct. 1928). Compare DuPont v. DuPont, 32 Del.Ch. 405, 409–410, 82 A.2d 376, 379 (Sup.Ct.1951).

■ Turning to the second prong of intervenor's procedural objection we note that for an interlocutory order of the Superior Court to be appealable it must determine substantial issues and establish legal rights between the parties. American Insurance Company v. Synvar Corporation, 7 Storey 315, 199 A.2d 755 (Sup.Ct.1964); Wagner v. Shanks, 6 Storey 555, 194 A.2d 701 (Sup.Ct.1963); Walsh v. Hotel Corporation of America, Del.Supr., 231 A.2d 458 (1967); Equitable Life Assurance Society of U. S. v. Young & Revel, Inc., Del.Supr., 250 A.2d 509 (1969). For history of rule in appeals from the Court of Chancery, see DuPont v. DuPont, *supra,* 32 Del.Ch. at 406–409, 82 A.2d at 377–379; Electrical Research Products, Inc. v. Vitaphone Corp., 20 Del.Ch. 417, 171 A. 738 (Sup.Ct. 1934). Considering the nature of the order in the present case, we find the requirements have been met. Obviously, to the divorce litigant, a ruling requiring a court without discretion to open the entire divorce file to a newspaper is a question of vital importance. In our judgment, the issue of access to court records is clearly substantial, albeit collateral to the merits of the divorce action. The order from which the appeal is taken certainly decides this issue, and it just as certainly establishes a legal right of the newspaper over the appellant. We look beyond the technical result to see what the Superior Court did. Hanby v. Maryland Casualty Company, Del.Supr., 265 A.2d 28 (1970). The interlocutory order of the Superior Court in this case is therefore appealable.

The question in the case at bar thus concerns access to court records, and is limited to the records of divorce actions. Although the intervenor suggests Constitutional matters, basically a problem of statutory construction is presented. As in nor-

mal course, we will treat the non-constitutional matters first.

13 Del.C. § 1505(a) presently provides:

"All hearings and trials shall be conducted in private by the court sitting without a jury, and not by any master, referee or other delegated person; but for reasons appearing sufficient to the court, any hearing or trial may be opened to the public."

The statute upon which the trial judge based his order is found at 13 Del.C. § 1506:

"'No record or evidence in any case shall be impounded or access thereto refused."

The intervenor contends that the statutes should be read literally by the Court, and that they are unambiguous, thus needing no construction. The appellant-husband, on the other hand, contends that the statutes are hopelessly in conflict. This conflict he argues should be resolved by holding that § 1505(a) repeals or modifies the earlier statute, § 1506, by implication. Thus, with perhaps minor reservation on the appellant's part, both sides agree that § 1506 is in effect a public access statute which grants an absolute right of access. We therefore will first examine the case on that assumption.

The predecessors to the two sections have co-existed side by side since 1907 when they were enacted as a part of an "Act Regulating Annulment of Marriage and Divorce." 24 Del.Laws, Ch. 221. See generally, DuPont v. DuPont, 7 Terry 592, 87 A.2d 394 (Sup.Ct.1952). The present § 1506 was,enacted in its present form as § 21 of the 1907 act. It has remained unchanged through subsequent codifications. See 1915 Revised Code, § 3024; 1935 Revised Code, § 3517; 13 Del.C. § 1505. Recently this section was renumbered. See 13 Del.C. § 1506.

The present § 1505(a) has a different history. In its original form, 24 Del.Laws, Ch. 221, § 18, the statute required that all divorce proceedings "be public". In 1909 it was amended to provide that all hearings shall "be public; provided that, for reasons appearing sufficient to the Court, the hearing and trials may be had before the Court privately in chambers." 25 Del.Laws, Ch. 213, § 5. The statute appears in that amended form at 1915 Revised Code, § 3021. In 1927 it was amended a second time at 35 Del.Laws, Ch. 187, § 1, providing that hearings "shall be had before the Court privately in Chambers; provided that, for reasons appearing sufficient to the Court, the hearing and trial in any particular case may be public." This form of the statute was codified in 1935 Revised Code, § 3514 and in 1953 at 13 Del.C. § 1503. In 1972 it was renumbered [13 Del.C. § 1505(a)] and modified slightly to the language quoted above.

Thus, the question, as presented by counsel, is the significance of the changes to 13 Del.C. § 1505(a). By providing generally for private hearings, did the General Assembly merely intend to exclude the public from the courtroom but continue to expose the litigation to public review of the file, including press review and newspaper coverage? Or did the General Assembly, absent special circumstances, intend to make divorce a private matter with the implication that the prior statutorily authorized access to a court divorce record was necessarily repealed or substantially modified? In this analysis, we will assume, as do counsel, that § 1506 was intended to be a public access statute.

 The general principles are well established. Repeal by implication is not favored. DuPont v. DuPont, *supra,* 7 Terry at 602–603, 87 A.2d at 399. It only occurs when the two statutes are so inconsistent that reconciliation is impossible. Hodson v. Hodson Corp., 32 Del.Ch. 76, 81, 80 A.2d 180, 182 (Ch.1951); In Matter of Diane, Del.Ch., 318 A.2d 629 (1974). Repugnancy, and not a mere difference in the provisions of the two acts, is the con-

trolling question. Philadelphia, B. & W. R. Co. v. Mayor and Council of Wilmington, 30 Del.Ch. 213, 218–219, 57 A.2d 759, 763 (Ch.1948). A court will adopt any reasonable construction to avoid a repeal by implication. Mayor and Council of Wilmington v. State ex rel. DuPont, 5 Terry 332, 351, 57 A.2d 70, 79 (Sup.Ct. 1947); State el rel. Green v. Foote, 5 W. W. Harr. 514, 527, 168 A. 245, 250 (Ct. in Banc 1933). But a statute will not be construed so as to require an absurd or unworkable result. E. I. DuPont de Nemours & Co. v. Clark, 32 Del.Ch. 527, 532–533, 88 A.2d 436, 438 (Sup.Ct.1952); Nationwide Mutual Insurance Company v. Krongold, Del.Supr., 318 A.2d 606 (1974). If a literal interpretation leads to unjust, absurd, or mischievous consequences inconsistent with the general statutory intention taken as a whole, such interpretation must give way to the general intent. Nationwide Mutual Insurance Company v. Krongold, supra; Magill v. North American Refractories Company, 36 Del.Ch. 185, 189, 128 A.2d 233, 236 (Sup.Ct.1956). Statutes, which are clear and unambiguous if read separately, may have absurd consequences when read together. Knox v. Georgia-Pacific Plywood Company, 11 Terry 315, 322–323, 130 A.2d 347, 352 (Sup.Ct.1957). If two statutes are so inconsistent that reconciliation is impossible, the latest in time will prevail. Wright v. Husbands, 36 Del. Ch. 416, 429, 131 A.2d 322, 330 (Sup.Ct. 1957).

It is literally possible to read the two statutes as suggested by the intervenor and say § 1505(a) relates only to a hearing and § 1506 affects only access to court records and evidence. But such a reading makes it extremely difficult to attribute any consistent purpose to the action of the General Assembly. If it is suggested that a closed hearing would be an aid to truthful testimony in areas of potential public embarrassment, family intimacy, etc., it certainly would undercut that purpose by publishing the same testimony in a public newspaper after a private hearing. The inherent con-

flict of such a literal construction, in our judgment, makes it extremely unlikely that such a construction was the general statutory intention of the General Assembly.

The policy reflected by the private hearing, it seems to us, is designed to achieve more than a hearing without a live audience. It is part of a trend in this century in this State to protect the privacy of individual litigants in certain sensitive areas of human relationships. Divorce does not stand alone in this regard. Presently, proceedings and records involving termination of parental rights, and adoptions, as well as matters in the Family Court, for example, are not available for public access. 13 Del.C. § 924; 13 Del.C. § 1107(e), § 1111; 10 Del.C. § 972. Admittedly, these statutes are specific in regard to record access, but there seems to us to be an intention to create a policy which might well extend beyond the literal language. In adoption cases, for example, the hearing provision, 13 Del.C. § 915, does not specifically state that the hearing shall be private and yet it can certainly be argued from the whole statute that was the intention.

Courts also have recognized the trend towards privacy in family matters. In Wife v. Husband, Del.Supr., 269 A.2d 214 (1970), this Court noted in a footnote:

"It is convenient to continue to refer to the parties as 'wife' and 'husband' despite the finality of the divorce. In view of the provisions of 13 Del.C. § 1503, requiring that all hearings and trials in divorce cases shall be private except when otherwise ordered by the Court, we have adopted the policy of publishing opinions in divorce cases anonymously."

It is also interesting to note the language of Chief Justice Layton in Lecates v. Lecates, 8 W.W.Harr. 190, 195, 190 A. 294, 296 (Super.Ct.1937) in speaking of the related area of public trial:

"At the same time it may be admitted, even where statutes exist requiring pub-

lic trials, that in proper cases, as for example where secret processes of manufacture are involved, or where the evidence to be offered is so foul that witnesses will be disinclined to disclose the truth, or where, for decency's sake, it should not be publicly heard, the courts are not without power to order trials to be conducted in private."

Thus, it seems that if the narrow construction issue presented here by the historical development of our divorce statute produces uncertainty as to legislative intent, developments in other areas of family law in Delaware offer guidance as to general legislative intent. It also seems to us that there has been judicial recognition of a general state policy. These policies in support of individual privacy and public decency will be frustrated if every court divorce file is completely open to public inspection.

It is, of course, true that all papers and evidence filed with a Court are records in public custody. But civil litigation is not infrequently merely a means to resolve private disputes. The State provides a forum for the peaceful and binding resolution of those private disputes as part of the process of establishing an orderly and fair society. Such cases or portions of such cases may or may not be of legitimate and reasonable public interest.

■ Frequently, it is loosely said that the public has a historic right of access to court records. But, strictly speaking, that is not the general common law rule. In general, a member of the public has a right to access to judicial records at common law if he has an interest therein for some useful purpose and not for mere curiosity. Anno., 175 A.L.R. 1260. A leading case is Re Caswell, 18 R.I. 835, 29 A. 259 (1893) wherein it was said:

" . . . [I]t is clearly within the rule to hold that no one has a right to examine or obtain copies of public records from mere curiosity, or for the purpose of creating public scandal. To publish broadcast [sic] the painful, and sometimes disgusting, details of a divorce case, not only fails to serve any useful purpose in the community, but, on the other hand, directly tends to the demoralization and corruption thereof, by catering to a morbid craving for that which is sensational and impure. The judicial records of the state should always be accessible to the people for all proper purposes, under reasonable restrictions as to the time and mode of examining the same; but they should not be used to gratify private spite or promote public scandal. And, in the absence of any statute regulating this matter, there can be no doubt as to the power of the court to prevent such improper use of its records."

To state the original common law positively, it is said at 66 Am.Jur.2d, Records and Recording Laws, § 15, p. 351:

"Every person is entitled to the inspection . . . of public records, including legislative, executive, and judicial records, provided he has an interest therein which is such as would enable him to maintain or defend an action for which the document or record sought can furnish evidence or necessary information."

The English precedents are reviewed at some length in Ferry v. Williams, 41 N.J. L. 332 (Sup.Ct.1879). Two facts emerge from that review. First, the existence of a suit was not a *sine qua non* for the exercise of the right of inspection. Second, inspection was justified in favor of a private party for a public right if the private party could sue to protect the public right. As the common law rule has developed in New Jersey and elsewhere, it must be shown that the complaint demonstrates a legitimate interest, not necessarily related to ownership or a lawsuit, and is motivated by a proper purpose. Moore v. Board of Freeholders of Mercer County, 76 N.J.Super. 396, 184 A.2d 748, 753–754 (1962);

Pyramid Life Insurance Company v. Masonic Hospital Association, 191 F.Supp. 51 (W.D.Okl.1961); Minneapolis Star and Tribune Company v. State, 282 Minn. 86, 163 N.W.2d 46 (1968); 66 Am.Jur.2d, Records and Recording Laws, § 15.

Some authorities call the right a "qualified" right. Courier-Journal & Louisville Times Company v. Curtis, 335 S.W.2d 934 (Ky.1960). It is generally held that judicial records are subject to inspection after completion of the proceedings, but this rule too is subject to the discretionary power of the court to impound and deny inspection when justice so requires. State ex rel. Williston Herald, Inc. v. O'Connell, 151 N.W.2d 758, 763 (N.D.1967); Sanford v. Boston Herald-Traveler Corp., 318 Mass. 156, 61 N.E.2d 5 (1945); Re Caswell, *supra.*

 Thus, at common law, there is no absolute right of a member of the public to inspect judicial records and this would remain true barring some constitutional or statutory grant. Furthermore, the press has no greater right to information than any other member of the public. Courier-Journal and Louisville Times Company v. Curtis, *supra*; Grand Forks Herald, Inc. v. Lyons, 101 N.W.2d 543 (N.D.1960); Trimble v. Johnston, 173 F.Supp. 651 (D. Ct.D.C.1959).

We recognize that we are dealing with a procedure governed by statute. But, even conceding when 13 Del.C. § 1506 was originally adopted at 24 Laws, Ch. 221, § 21, it may have had the literal meaning now urged by the intervenor, it is not necessarily true that the statute maintains the same meaning after amendment to another section of the whole statutory context.

Viewed in this manner, the question becomes whether subsequent amendments to 24 Laws, Ch. 221, § 18 amount to a plain intent on the part of the legislature to alter the law generally. Such modification has been found in an analogous situation. In DuPont v. DuPont, *supra,* 7 Terry at 597,

87 A.2d at 396, the Court considered a petition for suit money collateral to a suit for an annulment brought by the wife. The statute upon which the wife relied authorized the payment of suit money in the case of divorce. At the time it was passed the word "divorce" included what we now call annulment. Subsequent to the passage of the suit money statute, the divorce statute was changed, and annulment was defined separately. Considering the wife's argument that the word "divorce" in the suit money statute retained its original meaning, the Court ruled that the presumption in favor of the original meaning had been defeated because the revision of the divorce statute was inconsistent with this view.

In our case, the statutes were originally enacted as part of an act which was intended to regulate divorce practice in Delaware. In their original form the statutes in question can be read to complement each other. However, subsequent amendments to the present § 1505(a) indicate that the legislature changed the policy regarding the public aspect of divorce. Thus, the change in the statute now reflected at 13 Del.C. § 1505(a) could reasonably be viewed as limiting the access granted by § 1506 to persons properly interested in the divorce hearings.

We are inclined to feel that, if the 1907 statute was a public access statute, the General Assembly not later than the 1927 amendment necessarily intended to modify public access to divorce records by the statute generally making divorce hearings private.

But prudence demands that we examine this conclusion with suspicion to make certain that we are not making an independent policy judgment rather than construing legislative intent. Three factors, in addition to the literal language, give us considerable pause. First, the present § 1506 has remained unchanged since 1907, having been recodified in 1915, in 1935, and in 1953 and, as recently as 1972, having been

included in an Act of the General Assembly by way of numbering. Second, divorce has historically been a matter of public interest. Prior to our first divorce statute and indeed up to the Constitution of 1897, divorce jurisdiction was legislatively exercised. Brown v. Brown, 3 Terry 157, 163, 29 A.2d 149, 151 (Super.Ct.1942). D. v. D., 2 Terry 263, 267, 20 A.2d 139, 141 (Super.Ct.1941). This background would seem to make it more difficult to have a change in the law by implication if public access was the legislative intent in enacting the 1907 statute. Third, although the issue involved contempt and therefore was quite different, there has been judicial recognition for the proposition that a legislature can reasonably adopt a policy closing divorce hearings without necessarily affecting the free circulation of the records and evidence. In Re Shortridge, 99 Cal. 526, 34 P. 227 (1893), the California Supreme Court said the following:

" . . . If the legislature had intended to prohibit the publication of proceedings in cases tried with closed doors, it would have been easy to declare its will in that regard in express terms. It has not done so, and the right claimed is not essential to the execution of the authority conferred by the section. The assumption that the object of the statute was to protect the public from the contaminating influence of prurient revelations often made in actions of divorce, seduction, and criminal conversation is unwarranted. The object of the act is palpable. It was to secure decorum in the conduct of trials involving the relation of the sexes, and to protect witnesses of refined sensibilities from the ordeal which they might otherwise have to pass through in giving testimony of a delicate or filthy nature in the presence of a crowd of vulgar or curious spectators. To give effect to the section no other intention on the part of the legislature is necessarily implied . . . "

See also Scott v. Scott [1913] A.C. 417, 30 Am. & Eng.Ann.Cas. [Ann.Cas.1913E] 614.

But there is independent line of reasoning which we find decisive and which independently supports the conclusion suggested above and relieves us from the burden of finally deciding between the conflicting contentions made by the appellant and the intervenor.

Thus far, we have not examined the intervenor's contention and the parties' joint assumption that the purpose of the General Assembly in originally adopting the present § 1506 was to make the record in divorce actions accessible to the public at large. Upon examination of the 1907 statute in its historical context we are persuaded that this was not the legislative purpose at all.

Initially, it should be noted that the statute, unlike public access statutes or freedom of information statutes generally, does not specifically state the public at large is being granted access. But, even more importantly, we feel the historical context of the enactment shows a different and more limited purpose.

In particular, we note that in 1873, the General Assembly amended our divorce law adopting a statutory procedure whereby divorce cases were referred to a commissioner. 14 Del.Laws, Ch. 548. This was the procedure that was in effect immediately prior to the adoption of the 1907 divorce statute. 2 Woolley, Delaware Practice, Sec. 1639–1643 (1906); Superior Court Rule 17 (adopted September 30, 1905). It was the commissioner's duty "to proceed to hear and take in writing the evidence in the cause, and report the same, together with his finding or award thereon" to the Court. 1852 Code, Ch. 75 (as amended by 14 Del.Laws, Ch. 548) Sec. 4.

It is important and interesting to note that the commissioner had certain affirmative duties. If it appeared to the commissioner that "there [was] evidence pertinent to the issue which [had] not been produced . . . it [was] his duty, on his own motion, to summon before him witnesses to give such evidence" and he included such evidence in his return along with other tes-

timony. Superior Court Rule 17, Sec. 2. Moreover, it was "the duty of the commissioner in every case to report to the Court whether he [found] that there [was] or [was] not collusion between the parties, and if he [had] cause to believe that there [was] collusion, it [was] his duty to fully investigate the facts" including "summoning . . . witnesses" and "requiring the production of . . . writings." Rule 17, Sec. 2. The commissioner was to "take in writing the evidence in the cause, and report the same, together with his finding or award thereon, at the next term of . . . court." 1852 Code, Ch. 75 (as amended by 14 Del.Laws, Ch. 548) Sec. 4.

These duties demonstrate the investigative as well as the judicial nature of the commissioner's role as an arm of the Court. Given this background, the key factor in the procedure in regard to the instant case is return of the commissioner as noted at 2 Woolley, *supra,* Sec. 1642, p. 1116:

> "The depositions, exhibits and award together with the commission and copy of petition, should be sealed, and endorsed with the title, number and term of the cause."

Thus, it is important to note that under the regular practice, the commissioner's return was sealed as a matter of course and was sealed in regard to all, including the litigants and their attorneys and including a non-appearing defendant. This is made clear by Woolley in § 1643 which discusses the next step in the procedure which was called "publication".

> "SEC. 1643. Publication. When the commissioner has made his return, the court will not take it up or consider it until publication is asked for and ordered. Therefore at any time during the term, after the commissioner has made his return, the attorney for the libellant should apply to the Superior Court for the publication of the return. The papers are then unsealed, and if the find-

ing be for the libellant, he should prepare a blank decree for the signature of the court, enclose it with the return and depositions, and hand them back to the court for its consideration."

There is another historical factor worth noting. Since our first divorce statute in 1832, it has been recognized that divorce jurisdiction emanated solely from the act of the General Assembly and not from common law. Jeans v. Jeans, 2 Har. 38 (Super.Ct.1835); Brown v. Brown, *supra,* 3 Terry at 164, 29 A.2d at 152, (Super.Ct. 1942). Until the Matrimonial Causes Act of 1857 (20 & 21 Vict.C. 85), the Ecclesiastical Courts in England exercised sole judicial jurisdiction over matrimonial causes decreeing annulments of marriage and legal separations in certain cases. Brown v. Brown, *supra,* 3 Terry at 162, 29 A.2d at 151. The jurisdiction of the Ecclesiastical Courts was then terminated. See and compare Scott v. Scott, *supra,* and D. v. D., *supra,* 2 Terry at 266, 20 A.2d at 140 (Super. Ct.1941). Since the *Jeans* case, it has been contended and accepted that the principles developed by the Ecclesiastical Courts should be considered as "great lights and sound guides" in the administration of the law of divorce. Jeans v. Jeans, *supra,* 2 Har. at 41, 42; Brown v. Brown, *supra,* 3 Terry at 164, 29 A.2d at 152; D. v. D., *supra.* Our courts regard their precedents with the utmost respect in matrimonial causes and follow them wherever they are compatible with our system. DuPont v. DuPont, *supra,* 7 Terry at 599, 87 A.2d at 397.

This history is important because the commission system adopted in 1873 appears to have substantial similarities to the commission formerly used by the Ecclesiastical Courts. See Scott v. Scott, *supra.* While the *Scott* case indicates some disagreement on whether matrimonial hearings in such courts after publication were in open court, and, while our commission procedure provided broader rights of examination of witnesses in the party litigants, it is interesting to note the comments about the com-

mission proceedings by the Lord Chancellor, Viscount Haldane, at Ann.Cas.1913E 615–616:

" . . . Until shortly before the divorce court was set up it was not their practice to take evidence viva voce in open court. The evidence was taken in the form of depositions before commissioners, who conducted their proceedings in private. The parties were not represented at this stage in the fashion with which we are familiar. When a witness was tendered for examination the commissioners could, in the course of taking his deposition, put to him interrogatories delivered by the other side, but there was no cross-examination, or, for that matter, examination-in-chief, of the parties. Each side could tender witnesses, but until the evidence was complete neither side was allowed to see the deposition which had been taken. After the commissioners had finished their work, what was called publication took place.

"This did not mean that the evidence was published to the world, but only that the parties had access to it . . . "

We feel, in ascertaining the 1907 legislative intent in enacting the statute that now appears at 13 Del.C. § 1506, it is necessary to give weight to the divorce procedure under the statute and Superior Court rule immediately prior to the enactment including what appears to be ecclesiastical precedent for that procedure. In our judgment, the history shows that § 1506 was not intended as a public access statute at all. Rather, it was designed for the limited purpose of terminating the procedure of automatically sealing divorce records, including evidence, which had developed under the commission system and which denied even the parties access to such records, including any evidence independently developed by the commissioner, from at least the return of the commissioner until publication. We think our judgment in this regard is supported by the fact that Section 18 of the 1907 statute provided that "All hearings and trials shall be had before the court, and not before a master, referee, or any other delegated representative . . . " This shows the extent to which the statute was directed to the commission procedure.

In light of the history, we cannot find that § 1506 was intended as a public access statute, that is, was intended to broaden a public right of access to divorce records beyond the common law rule. The problem to which the General Assembly was addressing itself was quite different. Access to divorce records immediately prior to 1907 was less available than under the common law rule and, for a portion of the procedure, not available to the parties themselves. This practice was offensive to the common law tradition (Anno. 175 A.L.R. 1261, § 2) and, in view of the fact that statute makes no express reference to public rights, it seems to us that it should be interpreted merely as granting access to those persons legitimately interested.

Consequently, we find that § 1506 was only designed to guarantee the litigants absolute access to the judicial file in their own divorce case. We are therefore not faced with the statutory contradiction suggested by counsel in the present case. The statute does not prevent the Court, in its discretion, from sealing the file from others according to the common law rule. Delaware Courts have recognized the power to seal files in several unreported cases which did not involve divorce. Insofar as nonparties are concerned, there is no statutory right created by § 1506 and such persons, including the press, must rest their claim to access to divorce files, if any, on common law. Their right is conditional. As noted above, they have such a right if they can demonstrate a legitimate interest therein for some useful purpose. Anno. 175 A.L.R. 1260. The decision is a discretionary one of the trial court. We note in passing that these results conform with the policy in regard to a private or public hearing as now set forth in 13 Del.C. § 1505(a). The statutes are thus harmonized.

While the briefs and arguments before us primarily concern statutory construction, it has also been suggested by the intervenor that Constitutional issues are presented, in particular the Federal and State guarantees of freedom of the press and Article 1, Section 5 of the Delaware Constitution.

The only Delaware case cited is Barbieri v. News Journal Company, 6 Storey 67, 189 A.2d 773 (Sup.Ct.1963). But that case merely upheld the right of the press to republish an old news story of legitimate public interest in current events concerning the most recent use of the whipping post. It dealt with facts already in the public domain as a result of criminal activity. The case certainly does not indicate the legislature cannot constitutionally make divorce proceedings private. Nor does that case limit the authority of the Court to seal a file. There are special discretionary considerations to be made in divorce cases including the "curbing a certain harmful practice that is sometimes manifest in those persons who are inclined to feed a private and morbid curiosity through the channels of a public right." Compare 24 Am.Jur.2d, Divorce and Separation, § 334.

■ The special Delaware Constitutional provision guaranteeing freedom of the press to every citizen who undertakes to examine the official conduct of men acting in a "public capacity" is not abridged by a restriction of access in matters of divorce. Rather it is a grant to private citizens to publicly examine official conduct. It is not, and does not purport to be, a guarantee that material in judicial divorce records will be made available to the press.

■ Because of the close relationship between the concepts of a private hearing and limited access to divorce records, we have also considered Article 1, Section 9 of our State Constitution which reads in part: "All courts shall be open; . . ."

In Lecates v. Lecates, *supra,* the Court considered, without deciding, whether the Constitutional provision required public trials. If it does so require public trials in all cases, that fact could affect a decision on access to court records in divorce cases.

Our inquiry leads us to the conclusion, however, that this Constitutional provision was not directed to the question of public trial. Rather, such provision is derived from the Magna Charta right which read: "We will sell to no man, we will not deny to any man, either justice or right." 16A C.J.S. Constitutional Law § 708a. "The chief purpose of the Magna Charta provision was to prohibit the king from selling justice by imposing fees on litigants through his courts and to deal a death blow to the attendant venal and disgraceful practices of a corrupt judiciary in demanding oppressive gratuities for giving or withholding decision in pending cases." 16 Am.Jur.2d, Constitutional Law, § 382, p. 718; In re Lee, 64 Okl. 310, 168 P. 53 (1917). Our view in this regard is reinforced by the specific grant of the "right" to a "public trial" in criminal cases found in our Constitution. Article 1, Section 7. It appears that when such public trial right was intended, it was specifically granted. Moreover, if such a "open courts" provision relates to access to judicial records, the right of free access granted is limited to the parties and their attorneys. State v. Davis, 226 Ind. 526, 82 N.E.2d 82 (1948).

■ We conclude therefore that the intervenor has no more right than members of the public generally and cannot succeed here on the basis of Constitutional claims. Courier-Journal and Louisville Times Company v. Curtis, *supra;* Grand Forks Herald, Inc. v. Lyons, *supra;* Trimble v. Johnston, *supra.*

■ It has not been necessary in determining the legal questions on this appeal for us to review the factual content of this

record and we have not done so and therefore make no comment thereon. But it does seem appropriate to make some brief comment on the plaintiff's status as an elected public official. Without in any way attempting to suggest the proper dictates of reasonable discretion in this specific case, we do note generally that the mere fact that a divorce litigant is a public official does not in itself necessarily justify the public disclosure of the intimate details of his marital history. On the other hand, if the evidence in a divorce case relates to a litigant's activities in his public capacity, that may well be an appropriate ground for the exercise of discretion and the grant of access, in whole or in part, to the press.

We recognize that, in some cases, our construction of the legislative intent may create difficulty in ascertaining legitimate public interest. The public, of course, is always entitled to access to a decree of divorce. The intervenor itself in recent years has generally followed the laudable practice of limiting news stories about divorce cases to a listing of the decrees granted without even mentioning the grounds. Thus the problem case should be rare. Moreover, if the appropriate decision is not apparent to the trial court, there are ways to explore and determine legitimate public interest without necessarily giving full public access to the file. In one unreported sealed Chancery case, Vice Chancellor Short permitted counsel for the newspaper to examine the file record subject to the condition that the results of such examination would not be disclosed to anyone without further order of the Court.

The decision of the Superior Court is reversed and the case is remanded with leave to the intervenor, if it so desires, to reapply to the trial judge for access to the sealed divorce file, said reapplication, if any, to be determined as a discretionary matter.