MARY L. LECATES *v.* EDWARD R. LECATES.

(*February* 8, 1937.)

LAYTON, C. J., sitting.

*Robert G. Houston* for plaintiff.

*Frederick P. Whitney* for defendant.

Superior Court for Sussex County, No. 13, February Term, 1937.

LAYTON, C. J., delivering the opinion of the Court:

 Whether the words "All courts shall be open," contained in the *ninth Section* of *Article* 1 of the *Constitution,* mean that trials and hearings shall be conducted in public, is not clear. The language appears in all of the Constitutions of this State, and it may not be an idle supposition that the provision was inserted in the *Bill of Rights* for the purpose of forefending against abuses in the administration of justice that undoubtedly existed in England prior to the fall of the Stuart dynasty.

Jeremy Bentham (1748-1832) wrote,

"Only in proportion as publicity has place can any of the checks applicable to injustice operate. Where there is no publicity there is no justice."

And again,

"Publicity is the very soul of justice. It is the keenest spur to exertion and the surest of all guards against improbity. It keeps the judge himself while trying under trial."

The Earl of Halsbury, in *Scott v. Scott,* [1913] *A. C.* 417, *Ann. Cas.* 1913*E,* 614, in which a judgment in a nullity case that had been heard in private was reversed, commenting upon treatises of Mr. Emlyn in 1730, and of Mr. Barrington in 1766, observed,

"At all events Mr. Daines Barrington and Mr. Emlyn (both learned lawyers) were under the impression that the law of England required in their days that courts should be open."

This language is expressive of the thought that trials shall be conducted in public, and the concluding words are almost exactly those of the constitutional provision.

Undoubtedly the framers of our earliest constitution were familiar with the injustices of secret trials so frequently permitted by the Judges of England under the Stuart Kings, and the writings of English lawyers and jurists of the period antedating those charters of government; and, perhaps, it will be admitted that, in general, the conduct of court proceedings in private is contrary to that conception of justice which has obtained for centuries among English speaking people.

In *Bloomer v. Bloomer,* 197 *Wis.* 140, 221 *N. W.* 734, it was said that the purpose of the statutes requiring trials in public is to avoid abuses that arose out of star chamber proceedings; and the thought generally is that publicity is the great preventive of judicial abuses. *U. S. v. Ginsberg,* 243 *U. S.* 472, 37 *S. Ct.* 422, 61 *L. Ed.* 853.

The idea, therefore, that the provision of the *Bill of Rights* was intended to mean something more than that all persons shall have at all times the right of recourse to the courts for the protection of their rights is not entirely without support.

At the same time it may be admitted, even where statutes exist requiring public trials, that in proper cases, as for example where secret processes of manufacture are involved, or where the evidence to be offered is so foul that witnesses will be disinclined to disclose the truth, or where, for decency's sake, it should not be publicly heard, the courts are not without power to order trials to be conducted in private.

Still, if the constitutional provision is not a prohibition against trials in camera, the remedy, if a remedy is needed, lies with the Legislature. See 26 *R. C. L.* 1014; Opinion of Earl Loreburn in *Scott v. Scott, supra.*

It is not necessary, however, to decide the constitutional question, for the very language of the proviso of the Act gives the Court discretion, exercisable within reasonable limits, to hold in public trials of divorce actions.

Here, it appears from considered statements of counsel, and not denied, that the evidence against the defendant would, for the most part, be offered by members of the plaintiff's family; that the testimony was not of indecent character, or such as respectable witnesses would hesitate to give, and that the truth would better be discovered by an open hearing. In such circumstances, if any purpose and meaning is to be ascribed to the proviso, there seems to be no good reason why the discretion of the Court should not be exercised in favor of a public trial.

■■ The ground for divorce is "habitual drunkenness for two years." Drunkenness is intoxication. It is the effect produced upon the mind or body by drinking intoxicating liquor to such an extent that the normal condition of the subject is changed, and his capacity for rational action and conduct is substantially lessened.

"Habitual drunkenness," as a statutory ground for

divorce, means such fixed, irresistable custom of frequent indulgence in intoxicating liquor with consequent drunkenness as to evidence a confirmed habit and inability to control the appetite for intoxicants. See 9 *R. C. L.* 313; 19 *C. J.* 70; *Note to Sedgwick v. Sedgwick, Ann. Cas.* 1912*C*, 657.

Manifestly it is difficult to formulate any statement which, in every case, will indicate clearly what is deemed to be habitual drunkenness; but the phrase contemplates periodic frequency of indulgence, loss of power of normal action, and inability to resist temptation when opportunity offers.

It would not be difficult to arrive at a proper decision if the evidence offered by the plaintiff were alone to be considered. Giving that evidence face value, the charge of habitual drunkenness was brought home to the defendant under any definition of the term. Its effect, however, was greatly weakened by the palpable bias and prejudice shown by the plaintiff and her supporting witnesses. With one exception they were members of her family, her mother, sister and brother, all of whom failed to conceal a feeling of animosity toward the defendant, although it seems that they frequently attended the parties which they so strongly denounced, indulged themselves in drinking thereat, and made no effort to restrain the defendant in his alleged excesses.

While the defendant's witnesses were his friends and companions, there is no reason to suppose that they were any more biased in his favor than were the plaintiff's witnesses prejudiced against him. At least they were not members of his family; and their demeanor and apparent fairness and frankness contrasted favorably with the witnesses for the petitioner.

As in all civil cases, the burden was upon the plaintiff to establish the truth of her charge by a prepon-

derance of the evidence. The extreme caution and the unusual positiveness of persuasion required in criminal cases does not obtain. But there must be persuasion.

█ It is axiomatic that the credibility of testimony does not necessarily depend upon the number of witnesses. What is meant by "preponderance of evidence" is such evidence as, when balanced against opposing evidence, has more convincing force, whereby the greater probability is in favor of the party upon whom the burden rests. As said by Professor Trickett, quoted in 5 *Wigmore, Ev.,* § 2498,

"There is no measure of the weight of evidence (unless the witnesses on the evidential facts are counted) other than the feeling of probability which it engenders."

█ Having in mind the number of witnesses for the plaintiff and the defendant, their opportunity for observation, their manner of giving their testimony, their interest in the result, and all other considerations which are supposed to determine the weight of evidence, the most that can be said for the petitioner's cause is that her evidence is in even balance with that of the defendant. That is not sufficient. Having the burden of proof, her evidence must be, to some degree, more persuasive. Decree refused.