STATE *ex rel.*

THE HERALD MAIL COMPANY,

*a corporation*

*v.*

THE HONORABLE JOHN M. HAMILTON, *Judge,*

*etc., et al.*

(Nos. 14799, 14837)

Decided June 10, 1980.

*Jackson, Kelly, Holt & O'Farrell, F. Paul Chambers,* for Herald Mail Co. and for amicus curiae The Associated Press, et al., etc.

*Sherbow, Shea & Tatelbaum, Theodore Sherbow and William A. Agee, Stephen R. Dolly,* for Herald Mail Co.

*Steven A. Askin* for Leach.

*Oscar Bean, Pros. Atty.,* for respondent.

*James R. Snyder* for amicus curiae The Associated Press, et al., etc.

*DiTrapano, Jackson & Buffa and Rudolph L. DiTrapano,* for amicus curiae Daily Gazette Co.

MILLER, JUSTICE:

In this original writ of prohibition, the relator, The Herald Mail Company [Herald Mail], seeks to prohibit the enforcement of a closure order entered by the Circuit Court of Hardy County on February 27, 1980. The effect of this order was to bar members of the public and press from portions of a scheduled pretrial hearing in a murder case in which Robert M. Leach was the defendant.

Mr. Leach's counsel had filed with the trial court, in addition to a number of pretrial motions, a closure motion which in effect indicated that the defendant was willing to waive his right to a public and open pretrial hearing in order to avoid publicity that might jeopardize his right to a fair trial. Herald Mail, through one of its reporters, became aware of the closure motion and objected to it. The trial court permitted Herald Mail's counsel to appear and argue against the closure motion at a hearing on February 27, 1980.

At this hearing the court refused to order closure on the defendant's motion for bail, motion for bifurcated trial, motion *in limine* to preclude the State from referring to the name of the second murder victim during the trial involving the first murder victim, and defendant's motion to quash and abate the indictment.

However, the court did grant the closure motion in regard to "the admissibility of alleged statements made by the defendant to third parties and the evidence of

defendant's mental state of mind at the time said statements were allegedly made . . . ." This language is contained in the court's order of February 27, 1980, which also held that "there is a clear and present danger of potential prejudice to the defendant's right to a fair trial should the public be allowed to hear the in camera proceedings."

It is this portion of the court's order granting closure which Herald Mail seeks to prohibit. At the February 27 hearing, of which a record was made, it was acknowledged by the trial court that "[t]here has been no undue publicity, and what has transpired in the community to date has been reserved, conservative and very proper." Defense counsel conceded at the hearing that as far as he could tell, "the press in this county . . . [has] . . . done nothing to prejudice Mr. Leach's right to a fair trial." Significantly, no facts were introduced at the hearing to show what publicity had been given to the case. Defense counsel did not specify how his client would be prejudiced if the suppression hearing were kept open.

Upon the joint motion of the prosecutor and the defense attorney, the court directed, by an order of February 6, 1980, that all the State's disclosures in response to defense discovery motions be sealed. At the February 27 hearing, the prosecutor and defense counsel agreed that the court could review this material to assist it in its ruling on the closure motion. The sealed disclosure material essentially consists of a lengthy written report of the State Police investigation of the murder which contained summary statements of witnesses, including those of several witnesses with whom the defendant allegedly discussed the crime after its commission.

Herald Mail urges that under Article III, Sections 14 and 17 of the West Virginia Constitution, the public and press have a right to be present during a criminal trial, including pretrial hearings. It also seeks to have this Court declare a right of access under our counterpart to the First Amendment to the United States Constitution—Article III, Section 7 of the State Constitution. We

decline to decide this latter point, since the issue in this case can be resolved on the first constitutional ground.

## I

Herald Mail recognizes that the claim it advances here was rejected by a sharply divided Court in *Gannett Co. v. DePasquale*, 443 U.S. 368, 61 L. Ed. 2d 608, 99 S.Ct. 2898 (1979), and for this reason it seeks a resolution based on our State Constitution. The majority in *Gannett* held that the public has no constitutional right under the Sixth Amendment to the United States Constitution to attend criminal trials. This holding was predicated on the conclusion that the Sixth Amendment conferred the right to a public trial only on the accused and not on the public or press generally. As a consequence, the Court determined that the press, as a segment or agent of the public, had no constitutional right of access under the Sixth Amendment to a pretrial suppression hearing.[1]

The crucial disagreement between the majority opinion and the dissent in *Gannett* involved whether the common law rule of open proceedings, applicable to both civil and criminal matters and requiring access by the public, had been incorporated into the public trial provision of the Sixth Amendment. The majority disposed of this issue by stating:

> "Not many common-law rules have been elevated to the status of constitutional rights. The provisions of our Constitution do reflect an incorporation of certain few common-law rules and a rejection of others. . . ." [443 U.S. at 384-85, 61 L. Ed. 2d at 624-25, 99 S.Ct. at 2908].

The majority's conclusion with respect to the Sixth Amendment was framed in recognition that there are

---

[1] The Court did not decide the First Amendment claim presented by Gannett because it concluded that the trial court had sufficiently balanced the newspaper's right of access against the defendant's right to a fair trial in two respects: by holding a hearing, attended by Gannett, on the closure motion, and by providing a transcript of the suppression hearing.

separate and distinct provisions in many state constitutions which mandate that courts shall be open to all:

"The history [of the Sixth Amendment] totally fails to demonstrate that the Framers of the Sixth Amendment intended to create a constitutional right in strangers to attend a pretrial proceeding, when all that they actually did was to confer upon the accused an explicit right to demand a public trial. [Footnote omitted]. *In conspicuous contrast with some of the early state constitutions that provided for a public right to open civil and criminal trials* [footnote omitted], the Sixth Amendment confers the right to a public trial only upon a defendant and only in a criminal case." [443 U.S. at 385-87, 61 L. Ed. 2d at 625-26, 99 S.Ct. at 2908-09]. [Emphasis supplied].

The *Gannett* dissent found that these early state constitutional provisions for open proceedings, together with the common law requirement of public access to trials, did give a right of trial access to the public and press under the Sixth Amendment.

It may thus be said that the Court was unanimous in its recognition of the common law rule of open proceedings embodied in many state constitutions, but divided on the issue of whether this rule was imported into the Sixth Amendment.

In the present case, we believe that our counterpart to the Sixth Amendment—Article III, Section 14 of the West Virginia Constitution[2]—when read in light of our open courts provision in Article III, Section 17,[3] provides

[2] Article III, Section 14, provides in pertinent part:

*"Trials of crimes, and misdemeanors, unless herein otherwise provided, shall be by a jury of twelve men, public,* without unreasonable delay, and in the county where the alleged offence was committed, unless upon petition of the accused, and for good cause shown, it is removed to some other county...." [Emphasis supplied].

[3] Article III, Section 17, states:

"The courts of this State shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay."

a clear basis for finding an independent right in the public and press to attend criminal proceedings.

Read literally, Article III, Section 14 is not simply a counterpart to the Sixth Amendment,[4] for our constitutional provision does not couch the right to a public trial in terms of a right conferred on the defendant. Rather, it states a broader right: "Trials of crimes, and misdemeanors, unless herein otherwise provided, *shall be ... public ....*" [Emphasis supplied]. Thus, the right under our State Constitution is not limited by a reference to the accused, but mandates that the trial itself shall be public.

We have not had occasion to explore the public trial right under Article III, Section 14, to any great extent. In *State ex rel. Varney v. Ellis*, 149 W.Va. 522, 142 S.E.2d 63 (1965), we held in Syllabus Points 1 and 2:

> "Under Section 14 of Article III of the Constitution of West Virginia, it is mandatory that one charged with the commission of a crime be afforded a public trial."

> "One charged with a crime is not afforded a public trial within the meaning of Article III, Section 14, of the Constitution of West Virginia when his trial on said charge is held in the office of the county jailer."

The defendant in *Varney* sought a public trial, and this Court thus did not decide whether Article III, Section 14, confers a general right of access to the trial by the public. It cannot be doubted, however, that when the English common law right to a public trial, acknowledged in both the majority[5] and dissenting opinions in

---

[4] The literal language of the Sixth Amendment focuses on the right of the defendant:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial ...."

[5] The majority in *Gannett* gave this summary of the common law:

"For many centuries, both civil and criminal trials have traditionally been open to the public. As early as 1685, Sir John Hawles commented that open proceedings were necessary so 'that truth

*Gannett*, is construed in light of the history of the "open court" language found in Article III, Section 17 of our State Constitution, as well as the constitutions of other states, there emerges a clear constitutional mandate in this State requiring open public trials in criminal cases.[6]

As *Gannett* recognized, the English common law rule of open proceedings became embodied in colonial charters and state constitutions in America. The 1677 New Jersey Constitution—or, more accurately, the *Charter or Fundamental Laws, of West New Jersey*—provided in Chapter XXIII the right of the public to attend trials.[7]

---

may be discovered in civil *as well as* criminal matters. [Emphasis added (in *Gannett*)].' Remarks upon Mr. Cornish's Trial, 11 How. St. Tr. 455, 460. English commentators also assumed that the common-law rule was that the public could attend civil and criminal trials without distinguishing between the two. *E.g.*, 2 E. Coke, Institutes of the Laws of England 103 (6th ed. 1681) ('all Causes ought to be heard ... openly in the King's Courts'); 3 W. Blackstone, Commentaries 372; M. Hale, The History of the Common Law of England 343, 345 (6th ed. 1820); E. Jenks, The Book of English Law 73-74 (6th ed. 1967).

"The experience in the American Colonies was analogous. From the beginning, the norm was open trials. Indeed, the 1677 New Jersey Constitution provided that any person could attend a trial whether it was 'civil *or* criminal,' Concessions and Agreements of West New Jersey (1677), ch XXIII, quoted in 1 B. Schwartz, The Bill of Rights: A Documentary History 129 (1971) [Emphasis added (in *Gannett*)]. Similarly, the 1682 and 1776 Pennsylvania Constitutions both provided that '*all* courts shall be open,' 1 Schwartz, *supra*, at 140, 271 [emphasis added (in *Gannett*)]." [443 U.S. at 386 n. 15, 61 L. Ed. 2d at 625, 99 S.Ct. at 2908-09].

[6] Prior to *Gannett Co. v. DePasquale*, 443 U.S. 368, 61 L. Ed. 2d 608, 99 S.Ct. 2898 (1979), most federal circuit courts confronted with the question of public access concluded that there was a right to access by the public under the Sixth Amendment because of the strong common law policy favoring open trials. *See, e.g., United States v. Cianfrani*, 573 F.2d 835, 852-54 (3d Cir. 1978); *Stamicarbon, N.V. v. American Cyanamid Co.*, 506 F.2d 532, 540-42 (2d Cir. 1974); *United States v. Clark*, 475 F.2d 240, 246-47 (2d Cir. 1973); *Lewis v. Peyton*, 352 F.2d 791 (4th Cir. 1965).

[7] "That in all publick courts of justice for tryals of causes, civil or criminal, any person or persons, inhabitants of the said Province may freely come into, and attend the said courts, and hear and be present, at all or any such tryals as shall be there had or passed, that justice may not be done in a corner nor in any covert manner,

New Jersey's eloquent language was compressed in subsequent charters and constitutions of other states to the pithy command that "all courts shall be open." This mandate was typically coupled with the requirement that everyone shall obtain remedy by due course of law, or that justice shall be impartially administered, or both. *See, e.g.,* 1682 Frame of Government of Pennsylvania, Article V;[8] 1776 Constitution of Pennsylvania, § 26;[9] 1792 Constitution of Kentucky, Article XII, § 13;[10] 1802 Constitution of Ohio, Article VIII, § 7;[11] 1870 Constitution of Tennessee, Article I, § 17;[12] 1777 Constitution of Vermont, Ch. II, § XXIII.[13]

The uniform interpretation of the mandate that the courts "shall be open" by those state courts called upon to construe the provision in their constitutions is that this language confers an independent right on the public to attend civil and criminal trials, and not simply a right in favor of the litigants to demand a public proceeding. *See, e.g., Phoenix Newspapers, Inc. v. Superior Court,* 101

---

being intended and resolved, by the help of the Lord, and by these our Concessions and Fundamentals, that all and every person and persons inhabiting the said Province, shall, as far as in us lies, be free from oppression and slavery." [5 F. Thorpe, *American Charters, Constitutions and Organic Laws, 1492-1908* (7 Vols. 1909), [hereinafter Thorpe, at 2551].

[8] "That all courts shall be open, and justice shall neither be sold, denied nor delayed." [5 Thorpe, at 3060].

[9] "All courts shall be open, and justice shall be impartially administered without corruption or unnecessary delay...." [5 Thorpe, at 3088].

[10] "That all courts shall be open, and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by the due course of law, and right and justice administered, without sale, denial, or delay." [3 Thorpe, at 1275].

[11] "That all courts shall be open, and every person, for an injury done him in his lands, goods, person, or reputation, shall have remedy by the due course of law, and right and justice administered without denial or delay." [5 Thorpe, at 2910].

[12] "That all courts shall be open; and every man, for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial, or delay...."

[13] "All courts shall be open, and justice shall be impartially administered, without corruption or unnecessary delay...."

Ariz. 257, 418 P.2d 594 (1966); *Lecates v. Lecates*, 38 Del. 190, 190 A. 294 (1937) (dictum); *Brown v. State*, 222 Miss. 863, 77 So.2d 694 (1955); *In re Edens*, 290 N.C. 299, 226 S.E.2d 5 (1976); *E. W. Scripps Co. v. Fulton*, 100 Ohio App. 157, 125 N.E.2d 896 (1955); *Cohen v. Everett City Council*, 85 Wash.2d 385, 535 P.2d 801 (1975); *State v. Holm*, 67 Wyo. 360, 382-85, 224 P.2d 500, 508-09 (1950); *cf. United States v. Buck*, 24 Fed. Cas. 1289, 1293 (No. 14,680) (E.D. Pa. 1860); *Johnson v. Simpson*, 433 S.W.2d 644 (Ky. 1968); *State v. Copp*, 15 N.H. 212 (1844). Typical of the reasoning of these courts is *E. W. Scripps Co. v. Fulton, supra,* where the public interest was stated as follows:

> "It can never be claimed that in a democratic society the public has no interest in or does not have the right to observe the administration of justice. The open courtroom is as necessary and important in the interest of supporting the administration of justice as in the protection of the rights of a member of the public when on trial for a criminal offense."
>
> . . . .
>
> "[T]he defendants can not waive the right of the people to insist that the proceedings of the courts, insofar as practicable and in the interest of the public health and public morals, be open to public view. . . ." [100 Ohio App. at 162, 167, 125 N.E.2d at 900, 903].

On related issues, we have recognized the public's interest in the administration of our criminal justice system. In *State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979), in upholding the practice of allowing a private prosecutor to assist the official prosecutor in a case, we adverted to the public's interest in criminal trials by stating that "there may be those occasions when the employment of a private prosecutor would satisfy the public's concern that a given case not be given perfunctory treatment." [261 S.E.2d at 58].

In *State ex rel. Goodwin v. Cook*, ___ W.Va. ___, 248 S.E.2d 602, 604 (1978), we held, in part, that citizens and

taxpayers have standing "to challenge the constitutionality of a statute [W. Va. Code, 7-7-8, permitting the appointment of a special prosecutor] which not only affects the administration of justice, but requires the payment of public funds for a special prosecutor."

In *State v. Gary*, ____ W.Va. ____, 247 S.E.2d 420, 421 (1978), we held that before a trial court can deny bail or set bail at a given amount, it must hold a hearing and furnish a written statement of its reasons. We stated that the hearing and statement of reasons had a larger purpose:

> "[T]o provide the parties and the public the opportunity to realize that there is a careful, reasoned and judicious decision making process at work on an important judicial issue. . . ."

Once the right in the public to attend the trial is acknowledged, the same right must be accorded members of the press. The press not only constitutes a part of the general public, but it is well established that it operates in a special capacity as an agent or surrogate for the general public in its gathering and dissemination of information. This special status rests on a realistic recognition that it is impossible for any meaningful number of the general public to abandon their daily pursuits to attend trials, and a further acknowledgement that the press has valuable expertise in ferreting out information difficult for the general public to obtain. This surrogate relationship was aptly expressed in *Cox Broadcasting Corp. v. Cohn*, 120 U.S. 469, 491-92, 43 L. Ed. 2d 328, 347, 95 S.Ct. 1029, 1044-45 (1975):

> "[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations.

> Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally. With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice. See Sheppard v Maxwell, 384 US 333, 350, 16 L Ed 2d 600, 86 S Ct 1507 (1966)."

We have echoed these sentiments in *State ex rel. Daily Mail Publishing Co. v. Smith*, ___ W.Va. ___, 248 S.E.2d 269, 272 (1978), *aff'd*, 443 U.S. 97, 61 L. Ed. 2d 399, 99 S.Ct. 2667 (1979), by stating that "a robust, unfettered, and creative press is indispensable to government by free discussion and to the intelligent operation of a democratic society." Other courts have used the same reasoning in according a right to the press equal to that of the general public to attend criminal proceedings. *E.g., Phoenix Newspapers, Inc. v. Superior Court*, 101 Ariz. 257, 418 P.2d 594 (1966); *Westchester Rockland Newspapers, Inc. v. Leggett*, 48 N.Y.2d 430, 423 N.Y.S.2d 630 (1979); *New York Times Co. v. Starkey*, 51 A.D.2d 60, 380 N.Y.S.2d 239 (1976); *E. W. Scripps Co. v. Fulton,* 100 Ohio App. 157, 125 N.E.2d 896 (1955); *Cohen v. Everett City Council,* 85 Wash.2d 385, 535 P.2d 801 (1975).

However, it cannot be doubted, and relator here recognizes,[14] that there are limits on access by the public and press to a criminal trial. In the area of criminal trials, a long-established constitutional right to a fair trial is accorded the defendant. This principle is found in the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution, and in Article III, Section 10 of our own Constitution, and is based on

---

[14] "Relator does not contend that this Court should adopt a rule that *no* trial court can *ever*, under any circumstances, close judicial proceedings to the public. What is sought is a rule of constitutional dimension that would permit closure only in those extremely rare cases when there is no reasonable alternative . . . ." [Brief of Relator, at 21-22]. [Emphasis in original].

the recognition that widespread publicity may prejudice the defendant's right to a fair trial. *Gannett Co. v. DePasquale, supra; Murphy v. Florida,* 421 U.S. 794, 44 L. Ed. 2d 589, 95 S.Ct. 2031 (1975); *Sheppard v. Maxwell,* 384 U.S. 333, 16 L. Ed. 2d 600, 86 S.Ct. 1507 (1966); *Estes v. Texas,* 381 U.S. 532, 14 L. Ed. 2d 543, 85 S.Ct. 1628 (1965); *State v. Sette,* ____ W.Va. ____, 242 S.E.2d 464, 470 (1978). We need not attempt a complete assessment of the parameters of the area commonly called the "free press—fair trial field," since we are deciding only when a pretrial criminal proceeding may be closed to members of the public and press.[15]

Inherent in this question is our recognition that the term "trial" cannot be taken in its limited sense as that portion of the criminal proceeding which begins with the empanelling of the jury. This narrow view was accepted by the majority in *Gannett* but rejected by the dissent for reasons that we find compelling. The *Gannett* dissent made the practical observation that in many criminal cases, pretrial hearings may determine vital issues which can lead to the disposition of the entire case without a jury trial. Typically, pretrial hearings will involve claims relating to the voluntariness of the defendant's confession or matters involving the validity of warrants and evidence obtained thereunder that may be critical in proving the state's case.

In many instances, a pretrial hearing is like a trial without jury, since the trial judge is required to hear evidence and apply the law to the facts. Witnesses are sworn and the entire process is adversarial. The proceedings bear some analogy to other pretrial stages in a criminal case where the presence of the public and press has historically been allowed, such as in a preliminary hearing.

---

[15] A full treatment of this area can be found in the following: Fenner & Koley, *The Rights of the Press and the Closed Court Criminal Proceeding,* 57 Neb. L. Rev. 442 (1978); Note, *The Right to Attend Criminal Hearings,* 78 Col. L. Rev. 1308 (1978); Note, *Trial Secrecy and the First Amendment Right of Public Access to Judicial Proceedings,* 91 Harv. L. Rev. 1899 (1978).

Interwoven into the delicate area of prescribing when the press may be precluded from attending a pretrial hearing is the fact that there are traditional judicial techniques which can be invoked to safeguard the defendant's right to a fair trial where press coverage is claimed to have prejudiced the prospective jury panel. As noted in *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 49 L. Ed. 2d 683, 96 S.Ct. 2791 (1976), a change of venue, a thorough and individual *voir dire* of the jury, and the liberal use of challenges for cause, together with the traditional peremptory challenges, are available remedies to cure the effect of adverse pretrial publicity. Moreover, it is well within the bounds of judicial propriety to require that the parties not disclose their case in advance of trial to the press.[16]

It should also be remembered that in many suppression hearings the issue is not primarily the substantive content of the evidence to be suppressed, but rather the procedural methods applied by law enforcement officials in obtaining the questioned material. Consequently, in

---

[16] This is little more than what is required of a lawyer independently under the Code of Professional Responsibility, DR7-107 (B):

"A lawyer or law firm associated with the prosecution or defense of a criminal matter shall not, from the time of the filing of a complaint, information, or indictment, the issuance of an arrest warrant, or arrest until the commencement of the trial or disposition without trial, make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to:

"(1) The character, reputation, or prior criminal record (including arrests, indictments, or other charges of crime) of the accused.

"(2) The possibility of a plea of guilty to the offense charged or to a lesser offense.

"(3) The existence or contents of any confession, admission, or statement given by the accused or his refusal or failure to make a statement.

"(4) The performance or results of any examinations or tests or the refusal or failure of the accused to submit to examinations or tests.

"(5) The identity, testimony, or credibility of a prospective witness.

"(6) Any opinion as to the guilt or innocence of the accused, the evidence, or the merits of the case."

these situations there is a reduced likelihood that the contents of documentary evidence will become known. Moreover, it is possible for the trial court, as was done in the present case, to provide in advance that the questioned material be kept sealed until the court's dispositional ruling is made.

In the present case, an issue raised was the mental condition of the defendant at the time he gave the third party incriminating statements. It is difficult to perceive how evidence offered at a pretrial hearing relating to his mental condition could create any substantial prejudice that would not exist if presented at trial. The fact that the defendant may incur prior to trial some adverse consequence, such as public disclosure of a possible defense, is not a sufficient reason to close the hearing.

It is but a truism to observe that in the ordinary criminal case, neither the public nor the press may have any great interest in access. The problem will arise in the more controversial case, or in a case of great public moment, where the rights of the accused should be most zealously guarded. Yet, even in these cases, access cannot automatically be denied, even though prosecution and defense counsel may agree to its denial, for they cannot be the final arbiter of the right of the public and press to have access to the administration of justice.

In setting guidelines, we return to the primary purpose of closure, that of protecting the defendant's right to a fair trial, one free of widespread hostile publicity, so as to ensure him an unbiased jury. Absent a showing of widespread adverse publicity, the trial court should not grant a motion to close the hearing. Even where a clear showing is made as to widespread hostile publicity, this cannot end the inquiry. On a closure motion, the ultimate question is whether, if the pretrial hearing is left open, there is a clear likelihood that there will be irreparable damage to the defendant's right to a fair trial. Factors bearing on the issue of irreparable damage include the extent of prior hostile publicity, the probability that the issues involved at the pretrial hearing will

further aggravate the adverse publicity, and whether traditional judicial techniques to insulate the jury from the consequences of such publicity will ameliorate the problem.[17] The trial court, upon ruling that a closure motion is warranted, must extend its order no further than the circumstances warrant, and must assign its reasons for granting the closure. *Cf. State v. Gary, supra.*

As in so many areas of the law where both parties possess important rights, the task of setting the entire contour between their competing rights cannot be done by a single formula. The history of the law teaches that the wiser approach is to prescribe that course which can be discerned within the confines of the facts of the particular case. Few of us are endowed with the Einsteinian ability to formulate universal rules. We must be content to depend on the good judgment of a responsible press and our competent trial courts to apply this rule justly and fairly to each particular case.

In the present case, the defendant's motion for closure should not have been granted. The record fails to demonstrate facts which would compel a conclusion that widespread publicity prejudicial to the defendant existed. In fact, as earlier noted, both the trial court and defense counsel conceded the absence of prejudicial publicity. In addition, the record does not contain any facts or claim which would demonstrate how the defendant would suffer irreparable damage to his right to a fair trial if the proceedings were open to the public and press.

---

[17] In the present case, we are confronted only with the general considerations surrounding closure as they involve the defendant's right to a fair trial and the right of access by the public and the press. There may be occasions when special circumstances may independently tip the scale toward closure. *See United States v. Ruiz-Estrella,* 481 F.2d 723 (2d Cir. 1973) (federal government claim of secret airplane hijacker "profile"); *United States v. Cianfrani,* 573 F.2d 835 (3d Cir. 1978) (intercepted communications evidence under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*

For these same reasons, we reject the cross-assignment of error filed by the defendant, Robert M. Leach, objecting to the court's failure to close the pretrial hearing on his motion for bail, motion for bifurcated trial, motion *in limine,* and motion to quash and abate the indictment.

We are not disposed to grant an absolute writ of prohibition, since it was not possible for the trial judge to have anticipated the views of this Court in what can only be characterized as a developing area of the law. We, therefore, issue a moulded writ, prohibiting the enforcement of the trial court's February 27, 1980, closure order, but enabling the trial court to hold a further hearing on closure, if the defendant so requests, in light of the principles set out herein.

Upon the holding of such further hearing and entry of an order in consonance with this opinion, this writ shall be dissolved.

*Writ as moulded*
*awarded.*

MCGRAW, JUSTICE, *concurring:*

The majority deserves accolades for their recognition that our state Constitution guarantees the public and thereby the press a right of access to judicial proceedings. The error in its well-crafted opinion is that it limits, albeit in narrow circumstances, the people's right of such access.

As the majority opinion notes, the United States Supreme Court in *Gannet v. DePasquale,* 433 U.S. 368, 61 L.Ed.2d 608, 99 S.Ct. 2898 (1979), found no right of public access to pretrial criminal proceedings. This finding was essential to the *Gannet* holding if the Court was to avoid firmly ruling on the delicate issue of conflicting constitutional rights. This Court, however, finds a state constitutional right of access but unnecessarily places it in conflict with the right to a fair trial.

The right of access to governmental proceedings and the right to a fair trial do not conflict. The judicial article of the Constitution charges this Court to devise procedures and remedies to ensure fair trials. W.Va. Const. art. 8, § 3. The Court is not empowered to abridge constitutional guarantees to that end. Traditional judicial techniques are more than equal to the task. The majestic literature of common law jurisprudence bears windy witness to the flexibility of judicial device and to the boundless promise of judicial ingenuity.

The public is entitled to know how its government operates in order to secure it against "the danger of maladministration" spoken of in article 3, section 3 and to ensure that officials, even judges, remain true to their trust as servants of the people. W.Va. Const. art. 3, § 2, § 3.

Our Bill of Rights does not anticipate superior and inferior classes of rights and it is improperly, even unlawfully presumptuous for us to suggest that the abridgment of one is necessary to the preservation of another.