535 S.E.2d 727

STATE of West Virginia ex rel. Tod J. KAUFMAN, Judge of the Circuit Court of Kanawha County, Petitioner,

v.

Honorable Paul ZAKAIB, Judge of the Circuit Court of Kanawha County, the Kanawha County Commission, and George B.W., Respondents.

No. 27327.

Supreme Court of Appeals of West Virginia.

Submitted April 11, 2000.

Decided July 14, 2000.

James B. McIntyre, Esq., McIntyre & Collias, Charleston, West Virginia, Attorney for Petitioner.

William C. Forbes, Esq., Prosecuting Attorney, Charleston, West Virginia, Attorney for Kanawha County Commission.

Michael T. Clifford, Esq., Clifford, Mann & Swisher, Charleston, West Virginia, Attorney for George B.W.

Ancil G. Ramey, Esq., Steptoe & Johnson, Charleston, West Virginia, Attorney for Amicus Curiae The West Virginia Judicial Association.

McGRAW, Justice:

## I.

## BACKGROUND

■ The present request by Judge Kaufman for a writ of prohibition comes to us from a medical malpractice case filed in the Circuit Court of Kanawha County, but in truth it is the most recent incarnation of a divorce proceeding that has thrice found its way to this Court. We note some of the facts of the earlier cases because they provide a frame of reference for the instant dispute. On August 10, 1995, Sharon B.W. filed for divorce against her then husband George B.W.[1] At that time, the couple's young son was approximately four years old. The normal order of case assignment deposited this case on the docket of Kanawha County Circuit Court Judge Tod J. Kaufman. In December of that year, Judge Kaufman awarded temporary custody of the son to Sharon B.W. Subsequently, George B.W. moved for an emergency order to retain custody of the son based on allegations that the then boyfriend of Sharon B.W. had sexually abused the child. Judge Kaufman granted this emergency order and George B.W. retained custody of the son.

In December of that same year, Sharon B.W. moved the circuit court to allow her visitation with her son, and to require that the child undergo an expert evaluation regarding the allegations of sexual abuse; the court granted her motion. George B.W. then requested a writ of prohibition from this Court. In *State ex rel. George B.W. v. Kaufman*, 199 W.Va. 269, 483 S.E.2d 852 (1997) (*"George B.W. I"*), this Court granted the writ as moulded and required Judge Kaufman to hold a hearing to determine custody of the child, among other issues.[2]

Pursuant to this Court's opinion in *George B.W. I*, in March of 1997, Judge Kaufman held a hearing at which both parties presented expert testimony regarding the allegations of sexual abuse. During this multi-day hearing, George B.W.'s expert, psychologist Timothy J. Freeman, Ph.D., testified that he had interviewed the child, and in his expert opinion, the alleged sexual abuse had indeed occurred. Judge Kaufman refused to qualify Dr. Freeman as an expert, but did allow him to testify. Sharon B.W.'s expert, William Bernet, M.D., who was the medical director of the psychiatric hospital at Vanderbilt University, testified that, in his expert opinion, the abuse had not occurred, and that George B.W. and his expert, Dr. Freeman, had induced the allegations of abuse by asking suggestive questions of the child.

Judge Kaufman entered a final order on June 4, 1997, in which he awarded permanent custody to Sharon B.W. This prompted an appeal by George B.W. to this Court, which resulted in our opinion in *Sharon B.W. v. George B.W.*, 203 W.Va. 300, 507 S.E.2d 401 (1998) (*"George B.W. II"*). In that case, this Court found that Judge Kaufman had used the proper evidentiary standard and had not abused his discretion. Although ruling that the judge should have qualified Dr. Freeman as an expert, we found this to be harmless error. Finally we ordered that the lower

1. This Court continues to follow the practice of using initials to identify the parties in cases with sensitive facts. Although the instant case is not technically part of a divorce proceeding, it is still necessary to use initials, so as not to undermine previous efforts to protect the identity of the parties, particularly the child in this case. *See In*

*re Jeffrey R.L.*, 190 W.Va. 24, 26 n. 1, 435 S.E.2d 162, 164 n. 1 (1993).

2. For details of the hearing, see *Sharon B.W. v. George B.W.*, 203 W.Va. 300, 507 S.E.2d 401 (1998) (*"George B.W. II"*).

court "establish a meaningful visitation plan for the parties and the child." 203 W.Va. at 305, 507 S.E.2d at 406.[3]

Subsequent to the ruling in *George B.W. II*, Judge Kaufman directed Dr. Bernet to prepare a plan for reuniting mother and child, and for visitation by George B.W. Pursuant to this order, Dr. Bernet filed numerous reports with the lower court regarding how this reunification and visitation might best be accomplished.

In November 1997, the family law master assigned to the case conducted a hearing and made findings regarding the assets of the parties and the payment of attorney fees. Specifically, the family law master concluded that Sharon B.W. was not entitled to any share of certain stock that George B.W. held in his medical practice, and that Sharon B.W. should reimburse George B.W. for the attorney fees he incurred while contesting this issue.

Judge Kaufman did not agree with this finding, and instead found that Sharon B.W. was entitled to one half of the stock held by George B.W. in his medical practice, and furthermore, that George B.W. should reimburse Sharon B.W. for all of her litigation expenses. Again the dispute came before this Court, and on July 14, 1999, in *Sharon B.W. v. George B.W.*, 205 W.Va. 594, 519 S.E.2d 877 (1999) ("*George B.W. III*"), we reversed Judge Kaufman's finding regarding the stock, but upheld the award of attorney fees to Sharon B.W.[4]

Finally, on June 18, 1999, George B.W. filed the instant lawsuit, also in the Circuit Court of Kanawha County, but this time before Judge Paul Zakaib. George B.W. filed suit against Thomas J. Gillooly (the attorney who represented Sharon B.W.), Dr. Bernet (her expert), and Vanderbilt Univer-

sity, alleging, *inter alia*, that attorney Gillooly and Dr. Bernet conspired to provide the court with false information, and that by so doing they caused George B.W. a variety of damages, including emotional distress and interference with his custodial relationship with his son. On November 30, 1999, counsel for George B.W. served a Notice of Deposition upon Judge Kaufman, declaring that the judge should report to counsel's office for a deposition on December 20, 1999.

Judge Kaufman, by counsel, moved on December 8, 1999 for a protective order, arguing that any information regarding the divorce proceedings would be privileged, and that there was no discoverable information to be had by deposing him. By order dated January 28, 2000, Judge Zakaib found that Judge Kaufman was indeed subject to deposition.

In the order, Judge Zakaib first held that circuit court judges were not "highly placed public officials" deserving of special consideration, as set forth in *State ex rel. Paige v. Canady*, 197 W.Va. 154, 475 S.E.2d 154 (1996); Judge Zakaib then found that, even if one did apply the test set forth in *Paige*, that the plaintiff had satisfied the first, second and fourth prongs of the test, and by setting some limits on the deposition, that the third prong could also be satisfied.[5] In conclusion, Judge Zakaib found that Judge Kaufman was a material witness in the instant case, and that the plaintiff could depose him, subject to certain limitations on time, place, and conduct of the parties during the deposition.

On February 14, 2000, Judge Kaufman petitioned this Court for a Writ of Prohibition against Judge Zakaib to prevent him from enforcing the order requiring the depo-

---

**3.** Specifically we held:

> In conclusion, we find that the circuit court did not err in using the preponderance of evidence standard in determining the issue of whether there had been sexual abuse of the child, and that the circuit court was not clearly erroneous on the issue of sexual abuse. We do find that the court erred in not qualifying Dr. Freeman as an expert witness, but we find this not to be reversible error. Finally, we remand this matter to the circuit court with instruc-

tions to forthwith address the matter of visitation to establish a meaningful visitation plan for the parties and the child.

*Sharon B.W. v. George B.W.*, 203 W.Va. 300, 305, 507 S.E.2d 401, 406 (1998).

**4.** At some date, not available to us in the current record, George B.W. filed a Chapter 13 bankruptcy petition. The bankruptcy judge had since dismissed this action.

**5.** This opinion addresses the test, *infra*.

sition of Judge Kaufman.[6] On February 17, 2000, we issued a rule to show cause. For the reasons set forth below, we grant petitioner's writ, as moulded.

## II.

### STANDARD OF REVIEW

We are asked to consider the award of a writ of prohibition. As an aspect of our original jurisdiction, we have often addressed the standard for such an award:

Where the court, although having jurisdiction of the cause, during the trial of it, exceeds its powers in some matter pertaining thereto, for which there is no adequate remedy by the ordinary course of proceeding, the writ of prohibition lies, under the general principles of law. . . .

*State ex rel. Noll v. Dailey*, 72 W.Va. 520, 523, 79 S.E. 668, 669–70 (1913). This same idea is codified in W. Va.Code § 53–1–1 (1923),

[t]he writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power, when the inferior court has not jurisdiction of the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers.

This Court has also held that:

Where prohibition is sought to restrain a trial court from the abuse of its legitimate powers, rather than to challenge its jurisdiction, the appellate court will review each case on its own particular facts to determine whether a remedy by appeal is both available and adequate, and only if the appellate court determines that the abuse of powers is so flagrant and violative of petitioner's rights as to make a remedy by appeal inadequate, will a writ of prohibition issue.

Syl. pt. 2, *Woodall v. Laurita*, 156 W.Va. 707, 195 S.E.2d 717 (1973). Finally, when addressing a question somewhat like the instant dispute, this Court in *Paige, supra,* noted:

This Court has previously determined that erroneous discovery orders may be subject to a writ of prohibition. "A writ of prohibition is available to correct a clear legal error resulting from a trial court's substantial abuse of its discretion in regard to discovery orders." Syllabus point 1, *State Farm v. Stephens*, 188 W.Va. 622, 425 S.E.2d 577 (1992).

*State ex rel. Paige v. Canady*, 197 W.Va. 154, 158, 475 S.E.2d 154, 158 (1996). However, because this petition concerns a discovery order demanding the deposition of a judge, rather than a cabinet official, this Court faces a different question today.

Respondent George B.W. argues that this matter is not property decided via a writ of prohibition, and that an appeal would serve as an adequate remedy. This argument is not persuasive. Judge Kaufman still presides over the underlying divorce proceeding. If forced to testify, Judge Kaufman might find it necessary to remove himself from that case, and might not find it possible to return to the case if he were to prevail upon the instant issue on an appeal. Furthermore, if George B.W. were to prevail in his trial and then have this Court reverse that verdict by excluding the testimony of Judge Kaufman, George B.W. could be put to the difficulty and expense of a new trial. Having decided that the question is properly before the Court, we turn to the other arguments of the parties.

## III.

### DISCUSSION

Judge Kaufman argues first that, as a circuit court judge, he should be considered a "highly placed public official" and should be afforded the protections set forth in *Paige,*

---

**6.** Judge Kaufman also asks that this Court prohibit Judge Zakaib from enforcing a Freedom of Information Act request made by George B.W. and his counsel. As we are not aware of any order in which Judge Zakaib has ruled upon the request, this opinion does not address that issue. Nevertheless, this court would look with disfavor upon any attempt to do indirectly what this opinion prevents a party from doing directly. However labeled, any attempt to invade the thought processes of a judge, "would be destructive of judicial responsibility" *United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 1004–05, 85 L.Ed. 1429, 1435 (1941), and will not be permitted.

*supra.* He also claims that, because Judge Kaufman continues to preside over the (now stalled) divorce proceedings, it would be especially inappropriate for George B.W. to be able to inquire into Judge Kaufman's thought processes. Allowing such an inquiry, he claims, would be destructive to judicial independence.

George B.W. argues that circuit court judges are not "highly placed public officials" under *Paige*, and that Judge Kaufman has no special privilege to avoid being deposed in a case in which he is not presiding. While recognizing that judges are subject to the rule of law as much as anyone else, this Court cannot ignore the special status that judges have in our judicial system, and the effect this difference has on the process.

■ Because, in the context of the courtroom, a judge holds a special status, this Court has recognized that it is not appropriate for a judge to be a witness in a case in which he or she presides: "The judge presiding at the trial shall not testify in that trial as a witness. No objection need be made in order to preserve the point." W. Va. R. Evid., Rule 605. *Accord, State v. Kelley,* 192 W.Va. 124, 451 S.E.2d 425 (1994).

For similar reasons, it is not appropriate for a judge to serve as a character witness. Canon 2B of the Judicial Canons of Ethics provides that: "A judge shall not testify voluntarily as a character witness." *See, Reese, Matter of,* 201 W.Va. 177, 179 n. 5, 495 S.E.2d 548, 550 n. 5 (1997); *In the Matter of Phalen,* 197 W.Va. 235, 241 n. 10, 475 S.E.2d 327, 333 n. 10 (1996).[7] Bearing in mind the special role the judge plays in our legal system, we consider the question of whether or not a judge is a "highly placed public official."

The parties call our attention to *Paige, supra,* wherein plaintiffs sought the deposition of then State Tax Commissioner James Paige. The plaintiffs in that case had sought a large number of documents from the State Tax Department; they wished to depose the tax commissioner in order to discover certain information about the department's policy and procedures related to the release, or failure to release, the desired documents.

■ We decline to adopt petitioner's argument that we should declare judges to be highly placed public officials. However, a brief examination of *Paige* is still helpful to our analysis. In that case, the Court determined that high ranking public officials may be deposed, but only under special circumstances. We developed a four part test, and found that the party seeking the deposition had to demonstrate its necessity.[8]

In order to reach our conclusion in that case, this Court conducted an extensive review of national precedent regarding the de-

**7.** Canon 2B, in its entirety, provides:

A judge shall not allow family, social, political, or other relationships to influence the judge's judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or knowingly permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify voluntarily as a character witness.

Code of Judicial Conduct, Canon 2B (2000).

**8.** We fashioned three syllabus points to explain this process:

3. Highly placed public officials are not subject to a deposition absent a showing that the testimony of the official is necessary to prevent injustice to the party requesting it.

4. When determining whether to allow the deposition of a highly placed public official, the trial court should weigh the necessity to depose or examine an executive official against, among other factors, (1) the substantiality of the case in which the deposition is requested; (2) the degree to which the witness has first-hand knowledge or direct involvement; (3) the probable length of the deposition and the effect on government business if the official must attend the deposition; and (4) whether less onerous discovery procedures provide the information sought.

5. The burden is upon the proponent of the deposition to show the necessity of taking an oral deposition of a highly-placed government official.

Syl. pts. 3, 4, 5, *State ex rel. Paige v. Canady, supra.* We extended these protections to a former governor in a more recent case, holding:

The standard enunciated in Syllabus points 3 and 4 of *State ex rel. Paige v. Canady,* 197 W.Va. 154, 475 S.E.2d 154 (1996), continues to apply in instances where a party seeks to orally depose a former high-ranking government official pursuant to W. Va. R. Civ. P. 30.

Syl. pt. 15, *Arnold Agency v. West Virginia Lottery Comm'n,* 206 W.Va. 583, 526 S.E.2d 814 (1999).

posing of government officials. In so doing, we discovered that:

> It has been recognized that a member of the Cabinet or the head of a large executive department should not be called upon to give his deposition if such deposition is taken in order to probe the mind of the official to determine why he exercised his discretion as he did in regard to a particular matter. *De Cambra v. Rogers*, 189 U.S. 119, 122, 23 S.Ct. 519 [520–21], 47 L.Ed. 734 (1903) and *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999 [1004–05], 85 L.Ed. 1429 (1941).

*Paige*, 197 W.Va. at 160, 475 S.E.2d at 160 (quoting *United States v. Northside Realty Associates*, 324 F.Supp. 287 (N.D.Ga.1971)). Although we do not equate judges with so-called "highly placed public officials," we still find useful a renewed investigation into the history of this protection.

One of the cases relied upon in *Paige* was the case of *United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). One of a series of cases, this fourth and final case, *Morgan IV*, concerned an appeal by the U.S. Secretary of Agriculture. The Secretary had issued an order setting rates for stockyard services. Affected parties sued to set aside this order and called the Secretary as a witness, which the lower court allowed. On appeal, the U.S. Supreme Court addressed the propriety of having the Secretary testify:

> But the short of the business is that the Secretary should never have been subjected to this examination. The proceeding before the Secretary "has a quality resembling that of a judicial proceeding." *Morgan v. United States*, 298 U.S. 468, 480 [56 S.Ct. 906, 80 L.Ed. 1288]. Such an examination of a judge would be destructive of judicial responsibility. We have explicitly held in this very litigation that "it was not the function of the court to probe the mental processes of the Secretary." 304 U.S. 1, 18 [58 S.Ct. 773, 82 L.Ed. 1129]. Just as a judge cannot be subjected to such a scrutiny, compare *Fayerweather v. Ritch*, 195 U.S. 276, 306, 307 [25 S.Ct. 58, 49 L.Ed. 193], so the integrity of the administrative process must be equally respected.

*United States v. Morgan*, 313 U.S. at 422, 61 S.Ct. at 1004–05, 85 L.Ed. at 1435 (some citations omitted). The main impact of *Morgan* has been to create a concept known as "the deliberative process privilege," and sprouting from *Morgan* is a family of cases, like the *Paige* decision, concerning when administrative decision makers may be deposed or have their records subpoenaed. *See, e.g., Redland Soccer Club, Inc. v. Department of the Army of the United States*, 55 F.3d 827 (3d Cir.1995); *In re Grand Jury*, 821 F.2d 946 (3d Cir.1987), *cert. denied sub nom., Colafella v. United States*, 484 U.S. 1025, 108 S.Ct. 749, 98 L.Ed.2d 762, (1988); *NLRB v. Sears Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); *see also*, Kirk D. Jensen, *The Reasonable Government Official Test: A Proposal for the Treatment of Factual Information Under the Federal Deliberative Process Privilege*, 49 Duke L.J. 561 (1999).

■ However, this particular aspect of *Morgan*'s progeny is not applicable to the instant case, which concerns the propriety of demanding a judge's deposition. Judges, and other judicial officers, are in a different position, and are deserving of special protections.

Of central importance to our instant analysis, is the analogy drawn by Justice Frankfurter, and the implicit assumptions underpinning it, expressed in the following language: "The proceeding before the Secretary 'has a quality resembling that of a *judicial* proceeding.' Such an *examination of a judge would be destructive of judicial responsibility.*" *Morgan, supra* (citation omitted) (emphasis added). It is clear that Justice Frankfurter felt no need to explain that one may not "probe the mental processes" of a judge. For the Court at that time, it simply went without saying.

Since that time, a number of jurisdictions have used the basic rationale of *Morgan* to exclude the testimony of judges, or prohibit, outright, their testifying. In an action against the Secretary of the U.S. Department of Health and Human Services, a plaintiff who had been denied social security bene-

fits asserted that an administrative law judge was biased against claimants. Rejecting the plaintiff's attempt to "probe the mind of" the ALJ, the Third Circuit Court of Appeals declared: "It has long been recognized that attempts to probe the thought and decision making processes of judges and administrators are generally improper." *Grant v. Shalala*, 989 F.2d 1332, 1344 (3rd Cir.1993). *Accord, Commonwealth v. Vartan*, 557 Pa. 390, 733 A.2d 1258 (Pa.1999).

In a Virginia case, a judge held a hearing regarding a government motion to disqualify defense counsel. At that hearing, the defendant refused to answer certain questions and the judge found her in contempt. Subsequent to that hearing, the defendant then testified before a grand jury. Later charged with lying to the grand jury, the defendant subpoenaed the judge to somehow establish that the contempt finding in the unrelated hearing had "coerced her" into lying to the grand jury. On appeal, another judge noted: "Should a judge be vulnerable to subpoena as to the basis of every action taken by him, the judiciary would be open to 'frivolous attacks upon its dignity and integrity, and . . . interruption of its ordinary and proper functioning.'" *United States v. Dowdy*, 440 F.Supp. 894, 896 (W.D.Va.1977) (citing *United States v. Valenti*, 120 F.Supp. 80 (D.N.J.1954)).

In a Georgia case where a criminal defendant sought to dismiss the indictment against him on the basis that the system for the selection of juries was biased against minorities, the defendant declared his intention to call several judges as witnesses because they had participated in this allegedly biased process by selecting jury foremen in trials. Because he intended to call them, the defendant argued that the judges should also be recused from any consideration of his case. One of the judges in question ruled upon the case, and found that the defendant's theory

was flawed: "Even assuming judges are not immune from service of process, the cases seem to be in agreement that judges are under no obligation to divulge the reasons that motivated them in their official acts; the mental processes employed in formulating the decision may not be probed." *United States v. Cross*, 516 F.Supp. 700, 707 (M.D.Ga.1981), *aff'd*, 742 F.2d 1279 (11th Cir. 1984).[9]

Finally, a Louisiana case points out one of the dangers in forcing a judge to testify. In a case concerning former Louisiana Governor Edwards, in which the former governor had declared his intent to call the judge sitting on the case as a witness, the judge noted that this would be an improper method of forcing the judge to recuse himself. "Neither counsel nor a party may seek recusal of a judge by announcing that they intend to call the judge as a witness." *United States v. Edwards*, 39 F.Supp.2d 692, 705 (M.D.La.1999) (citing *United States v. Diana*, 605 F.2d 1307 (4th Cir.1979); *United States v. Cross*, 516 F.Supp. 700 (M.D.Ga.1981), *aff'd*, 742 F.2d 1279 (11th Cir.1984)).

■ It is clear that many jurisdictions have come to the same conclusion. Therefore we hold that, judicial officers may not be compelled to testify concerning their mental processes employed in formulating official judgments or the reasons that motivated them in their official acts.

■ The Court is mindful that this protection from discovery proceedings has its limits, and those limits are that a judge must be acting as a judge, and that it is information regarding his or her role as a judge that is sought. Although this concept of protecting a judge from deposition is not equivalent to judicial immunity, some parallels exist. Of course judicial immunity protects a judge

---

**9.** Courts have also applied this concept to "quasi-judicial" officials. In a case concerning a patent dispute, one party wished to call as a witness a former patent examiner, who had worked for the United States Patent Office. In deciding to allow the questioning, the court explained:

The essential line of demarcation appearing from the cases is that judicial and quasi-judicial officers may be compelled to testify only as

to relevant matters of fact that do not probe into or compromise the mental processes employed in formulating the judgment in question. . . . Thus, even though a particular inquiry may be factually directed, it may still be objectionable if it invades upon an official's good-faith decision-making prerogatives.

*Standard Packaging Corp. v. Curwood, Inc.*, 365 F.Supp. 134, 135 (N.D.Ill.1973).

from suit for any of his or her official actions as a judge. However, the U.S. Supreme Court has pointed out that there are limits to that immunity.

In *Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988), the United States Supreme Court reviewed a decision of the Court of Appeals for the Seventh Circuit, which affirmed the grant of summary judgment in favor of an Illinois state court judge who was sued by a court employee whom he had discharged. The judge had asserted that he was entitled to judicial immunity from civil suit. The Supreme Court ruled:

> When applied to the paradigmatic judicial acts involved in resolving disputes between parties who have invoked the jurisdiction of a court, the doctrine of absolute immunity has not been particularly controversial. Difficulties have arisen primarily in attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges. Here, as in other contexts, immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches.

484 U.S. at 227, 108 S.Ct. at 544, 98 L.Ed.2d at 565 (emphasis in original). We attempt to draw that same line in this case.

 Clearly, courts will face situations where people, who happen to be judges, witness events that are material to a given case. A judge might be driving to work and witness a car wreck or be involved in one himself. A judge might find it necessary to sue her contractor over inadequate repairs to her house. In such cases, these should be considered "acts that simply happen to have been done by judges." But such is not the situation we face in the instant case. George B.W. wishes to depose Judge Kaufman and ask him questions about the way he conducted an official proceeding. This Court cannot allow such an inquiry.

 The prohibition against compelling the testimony of a judge is reflected in a long-standing principle of our jurisprudence, namely, that a court speaks only through its orders. *See, State v. White*, 188 W.Va. 534, 536 n. 2, 425 S.E.2d 210, 212 n. 2 (1992) ("[H]aving held that a court speaks through its orders, we are left to decide this case within the parameters of the circuit court's order." (citations omitted)); *State ex rel. Erlewine v. Thompson*, 156 W.Va. 714, 718, 207 S.E.2d 105, 107 (1973) ("A court of record speaks only through its orders[.]" (citations omitted)).

 This Court has adhered to this principal when presented with conflicting signals from a circuit court. Always, the law favors written orders or records:

> As an initial matter, it is clear that where a circuit court's written order conflicts with its oral statement, the written order controls. Therefore, "we are left to decide this case within the parameters of the circuit court's order." *State v. White*, 188 W.Va. 534, 536 n. 2, 425 S.E.2d 210, 212 n. 2 (1992). *See also Harvey v. Harvey*, 171 W.Va. 237, 241, 298 S.E.2d 467, 471 (1982) ("[t]hat a court of record speaks only through its records or orders has been generally affirmed by this Court in subsequent cases"). Considering the above authority, we believe it is necessary to give greater credence to the circuit court's order. Thus, we find in this case that the defendants' concerns of the difference between the circuit court's ruling from the bench and the subsequent written order have no merit.

*Tennant v. Marion Health Care Foundation, Inc.*, 194 W.Va. 97, 107 n. 5, 459 S.E.2d 374, 384 n. 5 (1995). And if the record does not reveal an error, a court will conclude that one does not exist: "It will be presumed, where the record is silent, that a court of competent jurisdiction performed its duty in all respects as required by law." *State ex rel. Scott v. Boles*, 150 W.Va. 453, 457, 147 S.E.2d 486, 489 (1966); *see also*, 2 Franklin D. Cleckley, *Handbook on West Virginia Criminal Procedure* 497–98 (2d ed. 1993).

Finally, this Court notes that George B.W. has made no fewer than three attempts to have Judge Kaufman removed from this case. In September 1997, he alleged that Judge Kaufman had failed to remain impartial and had made improper *ex parte* contacts with opposing counsel. This Court examined this motion and denied it. Thereafter, in

October 1997 and August 1998, George B.W. again asked this Court to remove Judge Kaufman from the case for the same reasons. After consideration, these motions were also denied.

This Court cannot, and does not in this opinion, say that George B.W. has any improper motive behind his request to depose Judge Kaufman. However, we are aware of the temptation that some litigants may feel to engage in a form of "judicial sabotage." We are adamant that litigants should not be able to cast the *"sabot"* of a deposition notice into the judicial machinery, forcing it to grind to a halt simply to suit their own ends.[10.]

■■■■■ As the Judge from the Middle District of Louisiana (probably no stranger to the attempted "monkey-wrenching" of court process via the abuse of standard discovery procedures) noted with regard to a former governor's attempt to force him off a case by calling him as a witness: "Attempts to disqualify judges by indicating that the judge will be called as a witness are not favored and are rarely granted. Such an easy method of disqualifying a judge should not be encouraged or allowed." *United States v. Edwards*, 39 F.Supp.2d 692, 706 (M.D.La.1999). We agree.[11]

## IV.

## CONCLUSION

Accordingly, the Circuit Court of Kanawha County is prohibited from enforcing its order of January 28, 2000, requiring Judge Kaufman to submit to a deposition.

Writ granted as moulded.

Justice DAVIS, deeming herself disqualified, did not participate in the decision in this case.

Judge JOHN A. HUTCHISON, sitting by temporary assignment.

---

10. Although one popular origin of the word "sabotage" is that striking workers cast their wooden clogs (a *sabot* in French) into machinery to stop work at a factory, we recognize that this remains subject to dispute by etymologists.

11. As this Court noted in *Paige*, the purpose of shielding highly placed public officials from discovery is actually designed to protect *the public* more than the official. This is just as true when applied to judges, for judges could not do their jobs if their internal thought processes were subject to examination. It is the public that elected Judge Kaufman to the bench, and he should be permitted to do the job that the public has chosen him to do. However, this Court has not lost sight of the fact that all officials, even those "highly placed" are still servants of the people:

> All power is vested in, and consequently derived from, the people. Magistrates are their trustees and servants, and at all times amenable to them.

W.Va. Const. art. III, § 2. *Accord, Graf v. Frame*, 177 W.Va. 282, 352 S.E.2d 31 (1986); *Ralston v. Town of Weston*, 46 W.Va. 544, 33 S.E. 326 (1899). Members of this Court have also noted:

> The public is entitled to know how its government operates in order to secure it against "the danger of maladministration" spoken of in article 3, section 3 and to ensure that officials, even judges, remain true to their trust as servants of the people. W. Va. Const. art. 3, § 2, § 3.

*State ex rel. Herald Mail Co. v. Hamilton*, 165 W.Va. 103, 119, 267 S.E.2d 544, 552 (1980) (D. McGraw, J., concurring).